**J.C. and Quinton COLE, Plaintiffs,**

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al., Defendants.**

**No. 1:99–CV–2170–CAM.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 8, 2000.

Darryl Bradley Segraves, Moye O'Brien O'Rourke Hogan & Pickert, Atlanta, GA, for J.C. Cole, Quinton Cole, plaintiffs.

Linda J. Salfrank, phv, Blackwell Sanders Peper Martin, Kansas City, MO, Bruce McCord Edenfield, Amber Bollinger Shushan, Gray Hedrick & Edenfield, Atlanta, GA, for National Collegiate Athletic Association, Cedric Dempsey, Phil Grayson, defendants.

Bruce McCord Edenfield, Amber Bollinger Shushan, Gray Hedrick & Edenfield, Atlanta, GA, for Calvin Symons, defendant.

Carey Michael Johnson, Fellows Johnson & La Briola, Atlanta, GA, for National Collegiate Athletic Association Initial–Eligibility Clearinghouse, defendant.

## ORDER

MOYE, District Judge.

The above-styled action is before the court on 1) the motion by defendants National Collegiate Athletic Association, Cedric Dempsey and Phil Grayson to dismiss or, in the alternative, to strike [# 11]; 2) plaintiffs' motion for preliminary injunction [# 1–1]; 3) the motion by defendants NCAA Initial–Eligibility Clearinghouse and Calvin Symons for summary judgment or, alternatively, to dismiss [# 10]; and 4) plaintiffs' motion to strike [# 18].

## FACTS

Defendant National Collegiate Athletic Association (the "NCAA" or "defendant") is a voluntary unincorporated association of over 1,200 members consisting of colleges and universities, conferences, associations and other educational institutions. Its active members are four-year colleges and universities located throughout the United States. For purposes of bylaw legislation and competition in intercollegiate championship events, the active members are divided into Division I, II and III, with further classification of Division I members into Division I–A Football and Division I–AA Football.

NCAA legislation, adopted by representatives of member institutions, governs the conduct of the athletics programs of member institutions. In Division I, the Board of Directors is comprised of chief executive officers of member institutions. The Division I Board of Directors is responsible for establishing and directing the bylaws and rules governing Division I. The Board of Directors may also delegate legislative powers to the Division I Management Council.

The Management Council is composed of athletic administrators from member institutions and conferences, such as faculty representatives, athletic directors and senior women administrators. If the Management Council adopts operating bylaws or rules to govern Division I athletics, those bylaws or rules must be ratified by the Board of Directors.

Ultimately, if a sufficient number of member institutions disagree with an action taken by the Board of Directors, Division I active members may vote on the disputed legislation at the next annual NCAA convention. The NCAA constitution, bylaws and other governing legislation are set forth in the Division I Manual. The Division I Manual is published annually.

The University of Memphis is and was, at all times relevant, an NCAA Division I member institution. Plaintiff Quinton Cole (hereby referred to as "plaintiff") is not and has never been a member of the NCAA. The NCAA does not directly take action against student-athletes: the mem-

ber institutions do. The NCAA has taken no action of any kind against plaintiff and does not propose to do so in the future. However, NCAA eligibility rules applicable to student-athletes (adopted by the member institutions) are required to be applied and followed by member institutions. The legislation by which each member institution agrees to abide is set forth in the Manual as part of the NCAA Constitution.

Section 2.12 of the Manual sets forth "[t]he Principle Governing Eligibility": "Eligibility requirements shall be designed to assure proper emphasis on educational objectives, to promote competitive equity among institutions and to prevent exploitation of student-athletes." Among the "Purposes and Fundamental Policy" of the NCAA, in effect at all times referenced herein, and as set forth in the Manual, are the following:

1.2 Purposes.

The purposes of this Association are:

a. To initiate, stimulate and improve intercollegiate athletics programs for student-athletes and to promote and develop educational leadership, physical fitness, athletics excellence and athletics participation as a recreational pursuit;

b. To uphold the principle of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this Association;

c. To encourage its members to adopt eligibility rules to comply with satisfactory standards of scholarship, sportsmanship and amateurism;

\* \* \* \* \* \*

f. To supervise the conduct of, and to establish eligibility standards for, regional and national athletics events under the auspices of this Association.

\* \* \* \* \* \*

h. To legislate, through bylaws or by resolutions of a Convention, upon any subject of general concern to the members related to the administration of intercollegiate athletics.

1.3 Fundamental Policy

1.3.1 Basic Purpose. The competitive athletics programs of member institutions are designed to be a vital part of the educational system. A basic purpose of this Association is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports.

1.3.2 Obligations of Member Institutions. Legislation governing the conduct of intercollegiate athletics programs of member institutions shall apply to the basic athletic issues such as admission, financial aid, eligibility and recruiting. Member institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation.

NCAA Constitution § 2.1.1 also sets forth the principle relating to control and responsibility of members' athletics programs. In § 2.1.1, the NCAA Constitution provides as follows:

2.1.1. Responsibility for Control. It is the responsibility of each member institution to control its intercollegiate athletics program in compliance with the rules and regulations of the Association. The institution's chief executive officer is responsible for the administration of all aspects of the athletics program, including approval of the budget and audit of all expenditures.

In accordance with the Policy set forth in the Manual and in furtherance of the purpose set forth therein, Division I member colleges and universities have enacted minimum eligibility requirements which require an entering student-athlete to have achieved certain academic requirements to be eligible for intercollegiate athletics as a freshman. Bylaw 14.3 generally provides

that a student-athlete must have graduated from high school, pass at least 13 specified "Core Courses" and achieve a score on either the ACT or SAT which, when reviewed in connection with the student-athlete's grade point average in the identified courses, satisfies the sliding scale as set forth in Bylaw 14.3.1.1.1.[1] In order to meet this initial-eligibility requirement, the NCAA rules generally provide that the SAT or ACT score "must be achieved under national testing conditions on a national testing date." (Bylaws 14.3.1.1(b) and 14.3.1.4).

However, Bylaw 14.3 provides an approval process for scores achieved during a nonstandard administration of the SAT or Act as follows:

14.3.1.4.3 Nonstandard Test Administration. The Academics/Eligibility/Compliance Cabinet may approve the use of scores achieved during a nonstandard administration of the SAT or ACT for learning-disabled or handicapped students. A student who takes a nonstandard SAT or ACT still must achieve the minimum required test score; however, the test does not have to be administered on a national testing date.

The academics/Eligibility/Compliance Cabinet (the "Cabinet") has appointed the Division I Subcommittee on Initial–Eligibility Issues (the "Eligibility Subcommittee") to oversee the approval of the use of scores achieved by learning disabled or handicapped students during a nonstandard administration of the SAT or ACT exam. The members of the Cabinet and Eligibility Subcommittee are all representatives of NCAA member institutions.

The Eligibility Subcommittee, in making its determination, considers all information provided to it by or on behalf of a student with a disability. For example, the Eligibility Subcommittee reviews submitted information, which documents the existence and severity of the student's disabling condition and confirms that, for purposes of determining initial-eligibility, the student is eligible for accommodations provided by NCAA rules.

Any disabled student may request information from the NCAA about accommodations provided for students with disabilities. The students are notified of the information available on the Application Form for the NCAA Initial–Eligibility Clearinghouse. The materials explain, among other things, the approval process for the use of nonstandard test scores. For example, students are provided the following explanation in an NCAA publication entitled "Do You Dream of Playing College Sports?":

If you want to use courses for students with disabilities or non-standard test scores to meet NCAA freshman eligibility standards, you must submit a signed professional evaluation report completed within [sic] the last three years that includes diagnostic test scores of your disability and a copy of your current Individualized Education Plan (IEP) with the NCAA. The NCAA will review this information and determine your eligibility for accommodations for students with disabilities.

. . . . .

(Note: Physical handicaps that impair an individual's ability to learn and Attention Deficit Disorder/Attention Deficit Hyperactivity Disorder will be considered to be eligible for accommodations on a case-by-case basis. In addition, there must be a demonstrated history of

---

1. Defendant states that its membership enacted the initial-eligibility requirements to further the purpose of the NCAA to maintain intercollegiate athletics as an integral part of the educational program and to assure that student-athletes are representative of the student body and are not admitted to the institution solely for the purpose of participating in athletics. Defendant further states that, in enacting the initial-eligibility rules, college and university administrators have recognized that these essential minimum requirements enable freshmen student-athletes to better handle their college academic work along with the demand of participating in athletics during their first year.

accommodation provided in both instances.).

Bylaw 14.3 also provides for waivers of initial-eligibility requirements in certain circumstances. This process is· separate and apart from the approval process for nonstandard tests. That is, the Cabinet is authorized to grant exceptions to the initial-eligibility requirements "based on objective evidence that demonstrates circumstances in which a student's overall academic record warrants the waiver of the normal application" of the freshmen eligibility requirements. NCAA Bylaw 14.3.1.7. The Cabinet has appointed the Division I Initial–Eligibility Waivers Subcommittee (the "Waivers Subcommittee") to review requests for waivers. Like the Cabinet, the Waivers Subcommittee is comprised solely of representatives of NCAA member institutions.

The Waivers Subcommittee has established certain threshold review criteria which a waiver request must meet before the request will be heard by the subcommittee. However, the threshold criteria are waived in situations involving a waiver request filed by one suffering from a documented disability. The Waivers Subcommittee reviews all such requests (rather than delegating the review to a member of the NCAA staff) and evaluates each submission on a case-by-case basis, considering any and all information submitted by the student and/or the institution requesting the waiver on behalf of a student.

In addition, the Waiver Subcommittee reviews the student's high school record and any Individualized Education Plan (or other accommodation plan) to determine if a student took courses other than "Core Courses" that may have assisted the student in compensating for the disability.

The Waivers Subcommittee may also consider the extent to which the student's failure to meet any criteria is attributable to his disability, the accommodations available to disabled students at the student's high school and the accommodations actually received by the student while attending school. The Waivers Subcommittee may also take into account the assessments of the student's high school principal, counselors and teachers regarding the likelihood that the student will find academic success while also participating in a collegiate athletics program.

Plaintiff is currently enrolled as a freshman at the University of Memphis. Plaintiff graduated from high school with an overall grade point average of 2.367 and a Core Course grade point average of 2.075. Plaintiff took the SAT examination on three occasions, earning scores of 620, 760 and 540, respectively. Plaintiff has also taken the ACT with a composite average score of 14 and a sum score of 57. Based on these grades and test scores, plaintiff did not satisfy the initial-eligibility requirements of the NCAA and was not a "qualifier" for Division I competition.[2]

Plaintiff has been identified as having a Specific Learning Disability since he was in the second grade. (Exhibit A). On June 6, 1999, plaintiff timely filed an application for a waiver of the initial-eligibility requirements pursuant to NCAA Bylaw 14.3. ("Waiver Application"). On July 16, 1999, plaintiff was ruled ineligible by the NCAA to participate as a "qualifier" in intercollegiate competition.

On or about August 5, 1999, the Waiver Subcommittee met by telephone conference to consider plaintiff's application for Division I eligibility. (Grayson Aff., ¶ 37).[3]

---

**2.** Plaintiff's SAT and ACT test scores are too low to even appear on the "sliding scale". The lowest SAT score on the scale is 820 and the lowest ACT score on the scale is 68. For these lowest scores, the student-athlete must achieve a Core Course grade point average of 2.500 to be a qualifier. Plaintiff's highest test scores were far below the "sliding scale" and his grade point average was below 2.500.

**3.** Philip D. Grayson serves, and has served at all times relevant hereto, as Membership Coordinator of Academic and Disability Issues. In that capacity, Grayson acts as a staff

The committee considered all information and documents submitted on behalf of plaintiff to determine whether his overall academic record warranted waiver of the normal application of the freshman eligibility requirements. (Id.). After considering the information and documents, the committee determined that it had insufficient information on which to base a finding that plaintiff's overall academic record warranted such a waiver. (Id.). Defendant states that the Waiver Application failed to place the NCAA on notice of all grounds and all facts supporting plaintiff's request for waiver. Thus, on August 9, 1999, Philip D. Grayson, the NCAA Membership Coordinator of Academic and Disability Issues, sent a letter to plaintiff advising him of the Waiver Subcommittee's decision to deny his Waiver Application, listing as the only reason for the denial "the significant deficiencies in grade point average and [SAT/ACT] test score." In the letter, Grayson also informed plaintiff of his right to appeal the decision to the Cabinet. (Grayson Aff., ¶ 38).

On August 10, 1999, plaintiff and his father J.C. Cole, through counsel, wrote defendant Calvin Symons expressing confusion regarding defendant's denial of plaintiff's Waiver Application based on the fact that this was inconsistent with information received both in November 1998 and the week prior to the August 9, 1999 Grayson letter that plaintiff's Waiver Application was being processed and that "everything looked good." Plaintiff's letter explained that, relying on these representations, plaintiff's parents took him to the University of Memphis the prior week.[4]

By letter of August 13, 1999, plaintiff appealed defendant's denial of the Waiver Application. In addition to requesting that the original denial be reconsidered, plaintiff requested that he be temporarily permitted to use his athletic scholarship and practice with the University of Memphis football team during the pendency of the reconsideration/appeal of the denial. In this letter, plaintiff further requested that he be granted a "partial waiver" of the initial-eligibility requirements so that he could receive athletically related financial aid and participate in practice but not engage in intercollegiate competition during his initial academic year in residence.

In this letter, plaintiff pointed out that, since the "deficiencies in grade-point average and [SAT/ACT] test score" due to his learning disability were the reason for the waiver process in the first place, denying plaintiff's Waiver Application on that basis was to discriminate against him because of his learning disability. Plaintiff explained that it is discriminatory when a learning disabled student gains admission to the university at large, but is denied participation in athletics by the NCAA because he or she is disabled.

On August 16, 1999, defendant advised plaintiff that an appeal of the denial of a waiver based on a learning disability had been scheduled for Wednesday, August 25, 1999.

On August 18, 1999, plaintiff and his father, J.C. Cole, filed their complaint in DeKalb County, Georgia Superior Court seeking a declaration that defendant's alleged policy of denying learning disabled student-athletes participation in defendant's sponsored athletic programs violated Title III of the Americans With Disabilities Act (the "ADA"), seeking an injunction from discriminating against plaintiff on the basis of his disability, and seeking certification of plaintiff as being eligible to participate in intercollegiate athletics and to receive athletics-related financial aid. A hearing on plaintiffs' motion for preliminary injunctive

---

liaison to the NCAA Division I Initial–Eligibility Waiver Committee. (Grayson Aff., ¶ 3).

**4.** Plaintiff apparently returned to Georgia to his parents' residence for a brief period before returning to the University of Memphis to begin attending classes, which began on Thursday, August 26, 1999. Plaintiff points out that this was at the sole expense of plaintiff's parents.

relief and a temporary restraining order was scheduled before the Honorable Judge Clarence F. Seeliger for August 26, 1999. On August 24, 1999, defendants removed this matter to this court.

On August 25, 1999, the Cabinet considered plaintiff's appeal and considered all information and documents submitted on his behalf. (Grayson Aff., ¶ 40). After considering this information, the Cabinet denied plaintiff's request for a waiver. (Id.). At a hearing held on August 26, 1999, this court denied plaintiff's request for a temporary restraining order and scheduled a hearing on plaintiffs' motion for preliminary injunctive relief to be held on September 1, 1999.

Prior to the preliminary injunction hearing being held, plaintiff's counsel was apparently approached by defendants' counsel with the possibility of submitting a motion for reconsideration to defendants regarding defendants' continuing denial of a waiver of the initial-eligibility criteria to plaintiff. Defendants' counsel's actions were allegedly predicated on "new" information obtained during depositions of plaintiffs in anticipation of the preliminary injunctive hearing. The hearing was continued pending determination of the motion for reconsideration.

On September 9, 1999, based on plaintiff's resubmission of his application, which included new material not previously presented to the NCAA, plaintiff was declared a partial-qualifier (eligible to practice with his football team and to receive athletic financial aid but ineligible to participate in intercollegiate competition during his freshman year).

### LEGAL DISCUSSION

#### I. *MOTION TO DISMISS OR TO STRIKE.*

Defendants NCAA, Cedrick Dempsey and Phil Grayson move the court pursuant to Fed.R.Civ.P. 12(b)(6) to enter an order dismissing plaintiffs' complaint, or in the alternative, dismissing the purported claims of plaintiff J.C. Cole and striking, pursuant to Fed.R.Civ.P. 12(f), plaintiffs' prayer for compensatory and punitive damages. In their supplemental memorandum, these defendants assert that, in addition to the grounds set forth in their motion for dismissal, plaintiffs' claims have also been rendered moot and this court no longer has jurisdiction to entertain this matter.[5]

■ More specifically, as set forth above, plaintiff was declared a partial-qualifier on September 9, 1999. As a partial-qualifier, plaintiff was eligible to practice with his football team and to receive athletically-based student aid. However, as a partial-qualifier, plaintiff was ineligible to participate in intercollegiate football competition during his freshman year. He is fully eligible to practice and compete with his football team during the remainder of his college football career, consistent with NCAA rules and assuming he remains otherwise qualified. As of the close of the football season his freshman year, plaintiff will not be restricted from any aspect of the football program at the University of Memphis, so long as he remains otherwise eligible under NCAA rules. Because the football season of plaintiff's freshman year has ended, his participation in Division I football is no longer limited by his partial-qualifier status. The only season of competition which was affected by his partial-qualifier status is over, and no additional relief is available from this or any court. Money damages are not available under Title III of the ADA and this court can fashion no equitable remedy to benefit plaintiff.

■ It is well-settled under our Constitution that 1) the exercise of federal

---

5. Plaintiffs do not oppose the supplemental memorandum on procedural grounds. In addition, the court notes that subject matter jurisdiction may be raised at any time, including on appeal, and cannot be waived or conferred by agreement of the parties. Fed. R.Civ.P. 12(h)(3).

jurisdiction depends on the existence of a "case or controversy" and 2) a federal court has no authority to give opinions on moot questions or abstract propositions. *John Roe, Inc. v. United States*, 142 F.3d 1416, 1420–21 (11th Cir.1998) (citing *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) and *Church of Scientology v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992)). The Constitution's "case or controversy" requirement "mandates that the case be viable at all stages of the litigation; it is not sufficient that the controversy was live only at its inception." *Brooks v. Georgia State Bd. Of Elections*, 59 F.3d 1114, 1119 (11th Cir.1995) (citation and quotations omitted). Because mootness is a "threshold jurisdictional inquiry" and because a party's claims must remain viable throughout litigation, it is not inappropriate to raise the mootness of plaintiffs' claims at this stage of the proceeding. *See Id.*

 A case is rendered moot when events occurring after the commencement of a lawsuit "create a situation in which the court can no longer give the plaintiff meaningful relief." *Jews For Jesus, Inc. v. Hillsborough County Aviation Auth.*, 162 F.3d 627, 629 (11th Cir.1998). In other words, a case becomes moot when the issues presented are no longer "live" or when the parties lack a legally cognizable interest in the outcome. *Atlanta Gas Light Co. v. FERC*, 140 F.3d 1392, 1401 (11th Cir.1998) (citing *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). For example, in *Johnson v. Florida High School Activities Assoc., Inc.*, 102 F.3d 1172 (11th Cir.1997), the plaintiff brought suit alleging that his high school athletic association's eligibility requirements violated the ADA and the Rehabilitation Act. However, based on subsequent events (i.e., the close of the football season), the plaintiff's claim was rendered moot and dismissed. *Id.* at 1173.

 Here, the claims in plaintiffs' complaint, like the claims in *Johnson*, have been rendered moot by events occurring after the commencement of this lawsuit. As set forth in detail above, after plaintiff commenced this action, defendant declared plaintiff a partial-qualifier based on plaintiff's resubmission of his application. Plaintiff was allowed to practice with his football team during his freshman year and, assuming he remains otherwise eligible, will be allowed to both practice and compete with the team during the remainder of his college eligibility. The football season of plaintiff's freshman year has concluded and his competition with the football program at the University of Memphis is no longer restricted. Accordingly, plaintiff's claims are no longer "live" and this court can no longer offer meaningful relief to plaintiff. Plaintiff's purported claims no longer constitute a "case or controversy" and this court lacks jurisdiction to consider the matter further. *See e.g., Johnson*, 102 F.3d at 1173.

 In opposition, plaintiff asserts that *Johnson* is inapposite because it is distinguishable from this case in that that case involved an appeal of a district court injunction that had expired due to the football season having ended while this case involves voluntary subsequent acts on the part of defendants (i.e., the granting of partial-qualifier status). It is true that "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot." *DeFunis v. Odegaard*, 416 U.S. 312, 318, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (internal quotations and citations omitted). In *DeFunis*, an action was brought by DeFunis, an unsuccessful applicant to a state university law school, against various state and university officials challenging denial of admission to law school on ground that the admissions policy led to an unconstitutional denial of his application. The trial court granted DeFunis's requested relief to issue a mandatory injunction commanding the law school to admit DeFunis as a member of the first year entering class.

Accordingly, DeFunis began his legal studies. The state supreme court then reversed the judgment of the trial court and held that the law school admissions policy did not violate the Constitution. On appeal, the United States Supreme Court held that the case was moot because DeFunis was then presently in his last quarter of his final year of law school and any decision on the substantive issues would not prevent his graduation. The Supreme Court explained:

> [The above stated exception to mootness] would be quite relevant if the question of mootness here had arisen by reason of a unilateral change in the admissions procedures of the Law School. For it was the admissions procedures that were the target of this litigation, and a voluntary cessation of the admissions practices complained of could make this case moot only if it could be said with assurance that there is no reasonable expectation that wrong will be repeated.... But mootness in the present case depends not at all upon a 'voluntary cessation' of the admissions practices that were the subject of this litigation. It depends, instead, upon the simple fact that DeFunis is now in the final quarter of the final year of his court of study, and the settled and unchallenged policy of the Law School to permit him to complete the term for which he is not enrolled.

. . . . .

Moreover, just because this particular case did not reach the Court until the eve of the petitioner's graduation from Law School, it hardly follows that the issue he raises will in the future evade review. If the admissions procedures of the Law School remain unchanged, there is no reason to suppose that a subsequent case attacking those proce-

dures will not come with relative speed to this Court.

*DeFunis,* at 318, 94 S.Ct. 1704.

■ Similarly, in this case, defendant's granting of a partial-qualifier status does not constitute "voluntary cessation of allegedly illegal conduct." There is no allegation that defendant's policies changed or that defendants substantially lowered their essential eligibility requirements in granting the partial waiver to plaintiff. Defendants declared plaintiff a partial-qualifier based on newly submitted information which apparently satisfied the committee members that plaintiff's overall circumstances warranted such a waiver. As in *DeFunis,* mootness in the present case resulted not at all from a "voluntary cessation" of the certain eligibility standards that were the subject of this litigation. Rather, defendants embraced the standards and claim mootness due to the simple fact that plaintiff is now no longer restricted from any aspect of the football program at the University of Memphis, so long as he remains otherwise eligible under NCAA rules.

In further opposition, plaintiff insists that, but for the filing of this lawsuit, defendants would have never undertaken the "individualized consideration" required under the ADA. For the reasons set forth above, this is a moot question. Even if the question were not moot, for the sake of discussion, a review of the record in this case indicates that this is speculation on plaintiff's part not supported by any facts or evidence.[6] Contrary to plaintiff's contention that "defendants have offered absolutely no evidence that any 'analysis' actually took place before denying plaintiff's initial application for a waiver of initial-eligibility requirements," defendants have submitted an affidavit stating, among other things:

6. The court is well aware that, for Rule 12(b)(6) purposes, it must accept plaintiffs' factual allegations as true. *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *Pyles v. United Air Lines, Inc.,* 79 F.3d 1046, 1049 (11th Cir.1996). The court must draw all reasonable inferences in plaintiffs' favor. *In re Johannessen,* 76 F.3d 347, 349–50. The court is not required to speculate without any basis in fact.

[The Waiver Subcommittee] met by telephone conference to consider [plaintiff]'s application ... [and] considered all information and documents submitted on behalf of [plaintiff] to determine whether his overall academic record warranted waiver of the normal application of the freshman eligibility requirements. After considering the information and documents, the committee determined that it had insufficient information on which to base a finding that plaintiff's overall academic record warranted such a waiver.

(Grayson Aff., ¶ 37). Defendants state that plaintiff's initial application was denied "[b]ecause [plaintiff]'s incomplete waiver application did not place the NCAA on notice of all grounds and all facts supporting his request."

Plaintiff then points out that he was never informed of such reason and that the reason given to plaintiff for the denial was because of "significant deficiencies in grade-point average and [SAT/ACT] text score[s]." Plaintiff insists that this clearly indicates that defendants did not go beyond the grades and scores in reviewing the Waiver Application. Plaintiff asserts that because deficiencies in grade-point average and test score were the reason for employing the waiver process for a learning disability in the first place, defendants

cannot deny the waiver on that basis. The court disagrees.

■■■■ Even assuming, without deciding that Title III of the ADA [7] applies in this case,[8] it does not require an institution to "lower or to effect substantial modifications of standards to accommodate a handicapped person." *Pottgen v. Missouri State High School Activities Ass'n*, 40 F.3d 926, 931 (8th Cir.1994) quoting, *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). Further, accommodations are not reasonable if they impose "undue financial and administrative burdens" or if they require a "fundamental alteration in the nature of the program." *Id.* quoting, *School Board of Nassau County v. Arline*, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). The statute "does not require the NCAA to simply abandon its eligibility requirements, but only to make reasonable modifications to them." *Ganden v. NCAA*, 1996 WL 680000 at 15. Abandoning the NCAA's essential eligibility requirements in this case is not a reasonable modification.

■■■■ Eligibility requirements are deemed "essential" or "necessary" when such requirements are reasonably neces-

---

**7.** Title III of the ADA prohibits discrimination on the basis of disability in the full and fair enjoyment of any place of public accommodations owned, leased or operated by private entities. 42 U.S.C. § 12182(a).

**8.** Defendants submit that, as a threshold matter, the NCAA does not fall under the ambit of Title III of the ADA because the NCAA is not a place of public accommodation. The ADA regulations define a "place of public accommodation" as "a facility, operated by a private entity whose operations affect commerce and fall within at least one of the following categories ..." 28 C.F.R. § 36.104 (1996). The statute and regulations list 12 categories of places which are considered public accommodations. 42 U.S.C. § 12181(7); 28 C.F.R. § 36.104. These categories range from hotels to gymnasiums to insurance offices. *Id.* Defendants assert, among other things, that the NCAA is not a place of public accommodation

because it is a membership organization, composed primarily of colleges and universities, which fosters and regulates intercollegiate athletic competition by its members. *See Matthews v. National Collegiate Athletic Association, et al.*, 79 F.Supp.2d 1199 (E.D.Wash. 1999) (holding that the NCAA is not subject to Title III of the ADA and that the NCAA policies reasonably accommodated plaintiff's learning disability). In opposition, plaintiffs claim that Title III of the ADA regulates the NCAA's eligibility criteria because it is a private entity that owns, leases or operates "places of public accommodation", i.e., defendant's member institutions' stadiums, coliseums, arenas and other places of gathering. Plaintiffs point out that defendant exercises significant degree of control over the management of the competitions and use of its facilities.

sary to accomplish the purposes of a particular program. For example, in *Pottgen*, the Eighth Circuit Court of Appeals held that an athletic association's age rule governing participation in high school athletics constituted an essential eligibility requirement for purposes of the ADA and Rehabilitation Act. *Pottgen*, 40 F.3d at 929 (holding that a regulation establishing a maximum age rule for high school athletes is necessary as it safeguards against injury to other players and prevents unfair competition). *See also Sandison v. Michigan High School Athletic Ass'n*, 64 F.3d 1026, 1034–35 (6th Cir.1995) (same).

■ Defendant NCAA's minimum academic scores, which are set by representatives of member institutions, are an essential eligibility requirement. *See e.g., Ganden*, 1996 WL 680000 at 15 (finding "little doubt" that the eligibility requirements "serve important interests of the NCAA athletics"). The criteria are designed to ensure that an entering student-athlete is academically prepared, in light of the rigors of intercollegiate athletic competition, to succeed in his or her educational endeavors. The initial-eligibility requirement is also integral to the NCAA's mission of maintaining amateurism in intercollegiate sports. The purpose of the NCAA's academic eligibility requirements is to ensure that students are not merely admitted to universities to participate in intercollegiate sports, but also are admitted to promote and develop educational leadership and scholarship.

Here, plaintiff failed to meet the minimum standards. A court-ordered waiver of the academic standards would have essentially negated the academic eligibility standards and compromised the educational purpose of the NCAA. The NCAA Constitution, § 1.2. Such an order would have been inconsistent with the "reasonable accommodation" requirements of Title III. *See Ganden v. NCAA*, 1996 WL 680000 (holding that a plaintiff's requested modifications to the NCAA's grade point average

requirement would fundamentally alter the eligibility privilege).

As stated above, the ADA requires reasonable modifications for disabled individuals. As set forth in detail above, the NCAA provides, to anyone who asks, a packet of information regarding its available accommodations for disabled athletes. The packet sets forth the accommodations made by the NCAA with regard to its eligibility requirements, when appropriate. The Court in *Ganden* found that the waiver application process set forth in the By-laws and described in the packet provided "individualized consideration" to the student-athlete and an "assessment of the applicant's alleged disability for purposes of determining whether he or she is disabled." *Ganden*, 1996 WL 680000 at 15.

Here, defendants state that the NCAA allowed plaintiff to file his own Waiver Application and the Waiver Subcommittee thoroughly considered all information and documents before deciding to deny plaintiff's initial Waiver Application. For example, defendants state that the committee increased plaintiff's "core course" grade point average over the average calculated by his school and submitted on his high school transcript (increase from 1.833 to 2.075). Defendants submit that the waiver is only appropriate in a case of an athlete with a good "overall academic record," otherwise qualified for college, who cannot meet the minimum standards due to a documented disability. Defendants determined that such a waiver was not appropriate for plaintiff because he failed to demonstrate—to representatives of NCAA member institutions—that a waiver was merited. The reason set forth by defendant for its initial denial was not that plaintiff did not meet the specific score or grades, but that plaintiff's failure to meet those requirements was "significant".

■ Abandoning the eligibility requirements altogether for this or any athlete is unreasonable as a matter of law and is not required by the ADA. In addition, the NCAA's rules and decisions regarding the

concerns and challenges of student-athletes are entitled to considerable deference and this court is reluctant to replace the NCAA subcommittee [9] as the decision-maker on private waiver applications. *See e.g., Shelton v. NCAA,* 539 F.2d 1197, 1198 (9th Cir.1976) (holding that "it is not judicial business to tell a voluntary athletic association how best to formulate or enforce its rules."). As stated previously, however, this is a moot point as plaintiff was subsequently declared a partial-qualifier based on the newly-submitted information. Defendants explain that, on plaintiff's reapplication, the NCAA considered information about plaintiff not previously submitted, including, among other things, an increase in his grade point average based on a grade scale change at his high school.

Plaintiff next argues that, only after this lawsuit was filed and depositions were conducted of plaintiffs by defendants in anticipation of a preliminary injunction hearing before this court, was a partial waiver extended to plaintiff. Plaintiff insists that this was done in an effort to render plaintiff's case moot. Defendants explain, however, that their counsel's approaching plaintiff with the possibility of submitting to defendants an application for reconsideration of their continuing denial of a waiver was based on "new" information obtained during the depositions. Plaintiff has not denied that there was "new" information submitted with his application for reconsideration. Plaintiff has not set forth any facts from which the court could infer that defendants' actions were solely for purposes of mooting this lawsuit. Moreover, plaintiff has not alleged any facts to

indicate that defendants routinely deny waiver to learning disabled student-athletes based solely on grades and test scores and then grant partial-qualifier status to moot any lawsuits resulting therefrom.

This is not a class action and plaintiff no longer has a live case or controversy before this court. His claims are moot as a matter of law and this court cannot issue an advisory opinion regarding the NCAA's initial-eligibility requirements. As this court cannot grant meaningful relief to plaintiffs,[10] the complaint must be dismissed as moot.

Therefore, defendants' motion to dismiss is hereby GRANTED.

## II. *ALL OTHER MOTIONS.*

In view of the above ruling dismissing the complaint, the court hereby DENIES all remaining motions as moot.

### *CONCLUSION*

In sum, the court hereby 1) GRANTS defendants National Collegiate Athletic Association, Cedric Dempsey and Phil Grayson's motion to dismiss or, in the alternative, motion to strike [# 11]; 2) DENIES plaintiffs' motion for preliminary injunction [# 1–1] as MOOT; 3) DENIES motion for summary judgment or, alternatively, to dismiss defendants NCAA Initial–Eligibility Clearinghouse and Calvin Symons [# 10] as MOOT; and 4) DENIES plaintiffs' motion to strike [# 18] as MOOT.

---

9. The NCAA subcommittee is comprised of certain members of the faculty, administrators and athletic directors who are, by virtue of their professions, more closely attuned to the best indicators of a student's ability to successfully meet the challenges of academic and athletic pursuits.

10. Plaintiffs' demand for monetary and punitive damages is improper because the only claims asserted arise under Title III of the

ADA and no such damages are available thereunder. *Jairath v. Dyer,* 154 F.3d 1280, 1284, n. 7 (11th Cir.1998); *Pona v. Cecil Whittaker's Inc.,* 155 F.3d 1034, 1038 (8th Cir.1998). The remedy for violation of Title III of the ADA is limited to injunctive relief. 42 U.S.C. §§ 12188(a), 2000a–3(a)(3); 28 C.F.R. § 36.501. Plaintiffs agree that their prayer for monetary and punitive damages should be stricken.