Jeremy BLOOM, Plaintiff–Appellant,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association; and Regents of the University of Colorado, a body corporate, Defendants–Appellees.

No. 02CA2302.

Colorado Court of Appeals,
Div. V.

May 6, 2004.

Smittkamp & Walters, LLC, James C. Smittkamp, Peter J. Walters, Boulder, Colorado; Wilcox & Ogden, P.C., Ralph Ogden, Denver, Colorado; Bell, Boyd & Lloyd, LLC, Peter G. Rush, Chicago, Illinois, for Plaintiff–Appellant.

Holme Roberts & Owen, LLP, Colin G. Harris, Dennis J. Baarlaer, Boulder, Colorado; Spencer Fane Britt & Browne, LLP, Linda J. Salfrank, Jonathan F. Duncan, Kansas City, Missouri, for Defendant–Appellee National Collegiate Athletic Association.

Office of University Counsel, Joanne M. McDevitt, David P. Temple, Michael W. Schreiner, Jeremy R. Hueth, Denver, Colorado, for Defendant–Appellee Regents of the University of Colorado.

Opinion by Judge DAILEY.

In this dispute concerning eligibility to play college football, plaintiff, Jeremy Bloom, appeals the trial court's order denying his request for a preliminary injunction against defendants, the National Collegiate Athletic Association (NCAA) and the University of Colorado (CU). We affirm.

## I. Background

The NCAA is a voluntary unincorporated association that regulates intercollegiate amateur athletics among its more than 1200 member colleges and universities. Its rules are established by representatives of member institutions and are carried out by its Council. Among other things, it maintains rules of eligibility for student participation in intercollegiate athletic events.

Bloom, a high school football and track star, was recruited to play football at CU. Before enrolling there, however, he competed in Olympic and professional World Cup skiing events, becoming the World Cup champion in freestyle moguls. During the Olympics, Bloom appeared on MTV, and thereafter was offered various paid entertainment opportunities, including a chance to host a show on Nickelodeon. Bloom also agreed to endorse commercially certain ski equipment, and he contracted to model clothing for Tommy Hilfiger.

Bloom became concerned that his endorsements and entertainment activities might interfere with his eligibility to compete in intercollegiate football. On Bloom's behalf, CU first requested waivers of NCAA rules restricting student-athlete endorsement and media activities and, then, a favorable interpretation of the NCAA rule restricting media activities.

The NCAA denied CU's requests, and Bloom discontinued his endorsement, modeling, and media activities to play football for CU during the 2002 fall season. However, Bloom instituted this action against the NCAA for declaratory and injunctive relief, asserting that his endorsement, modeling, and media activities were necessary to support his professional skiing career, something which the NCAA rules permitted.

In his complaint, Bloom alleged: (1) as a third-party beneficiary of the contract between the NCAA and its members, he was entitled to enforce NCAA bylaws permitting him to engage in and receive remuneration from a professional sport different from his amateur sport; (2) as applied to the facts of this case, the NCAA's restrictions on endorsements and media appearances were arbitrary and capricious; and (3) those restrictions constituted improper and unconscionable restraints of trade.

For these reasons, Bloom requested that the NCAA restrictions be declared inapplicable, and that the NCAA and CU be enjoined from applying them, to activities originating prior to his enrollment at CU or wholly unrelated to his prowess as a football player.

The trial court ordered CU joined as an indispensable party in the case, and CU aligned with the NCAA as an involuntary defendant. After an evidentiary hearing, the

trial court determined that, although Bloom was a third-party beneficiary of NCAA by-laws, he was not entitled to preliminary injunctive relief under the six-part test of *Rathke v. MacFarlane*, 648 P.2d 648, 653–54 (Colo.1982). The trial court found that Bloom had satisfied three parts of the test: (1) there is a danger of real, immediate, and irreparable injury which may be prevented by injunctive relief; (2) no plain, speedy, and adequate remedy is available at law; and (3) the injunction would preserve the status quo pending trial on the merits. However, the trial court found that Bloom had not satisfied the other parts of the test: (4) there is a reasonable probability of success on the merits; (5) granting a preliminary injunction would not disserve the public interest; and (6) the balance of equities favors the injunction.

Bloom appeals the trial court's ruling under C.A.R. 1(a)(3).

## II. Standard of Review

■ Preliminary injunctive relief is designed to protect a plaintiff from sustaining irreparable injury and to preserve the power of the district court to render a meaningful decision following a trial on the merits. The power to grant a preliminary injunction "should be exercised sparingly and cautiously and with a full conviction on the part of the trial court of its urgent necessity." *Rathke v. MacFarlane, supra,* 648 P.2d at 653.

A preliminary injunction is not warranted unless the trial court finds that the moving party has demonstrated each of the Rathke factors. *Rathke v. MacFarlane, supra,* 648 P.2d at 654 ("If each criterion cannot be met, injunctive relief is not available."); *see also Atmel Corp. v. Vitesse Semiconductor Corp.,* 30 P.3d 789, 796 (Colo.App.2001)("since all the necessary criteria were not established, entry of the preliminary injunction ... was error").

We review the trial court's preliminary injunction decision under an abuse of discretion standard. *Rathke v. MacFarlane, supra,* 648 P.2d at 653. Under that standard, we examine the court's ruling to determine whether it is based on an erroneous application of the law, *Atmel Corp. v. Vitesse Semi-conductor Corp., supra,* 30 P.3d at 795–96, or is otherwise manifestly arbitrary, unreasonable, or unfair. *Bd. of County Comm'rs v. Fixed Base Operators, Inc.,* 939 P.2d 464, 467 (Colo.App.1997).

## III. Claims on Appeal

Initially, we limit our consideration on appeal to Bloom's claims of breach of contract and arbitrary and capricious action by the NCAA. Although Bloom refers to his restraint of trade claim in a footnote in the opening brief, this reference is insufficient to warrant review of that claim. *See United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991)("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim."); *see also People in Interest of D.B–J.,* 89 P.3d 530, 2004 WL 439551 (Colo.App. No. 03CA0893, Mar. 11, 2004)(declining to address contention lacking references to supporting facts, specific arguments, or authorities).

## IV. Standing

We reject the NCAA's assertion that Bloom lacked standing to pursue claims for breach of contract or arbitrary and capricious action on the part of the NCAA.

A party has standing to seek relief when he or she has suffered actual injury to a legally protected interest. *Turkey Creek, LLC v. Rosania,* 953 P.2d 1306, 1314 (Colo. App.1998).

■ A person not a party to an express contract may bring an action on the contract if the parties to the agreement intended to benefit the nonparty, provided that the benefit claimed is a direct and not merely incidental benefit of the contract. While the intent to benefit the nonparty need not be expressly recited in the contract, the intent must be apparent from the terms of the agreement, the surrounding circumstances, or both. *Parrish Chiropractic Ctrs., P.C. v. Progressive Cas. Ins. Co.,* 874 P.2d 1049, 1056 (Colo. 1994).

■ Here, the trial court found, and we agree, that the NCAA's constitution, bylaws, and regulations evidence a clear intent to

benefit student-athletes. And because each student-athlete's eligibility to compete is determined by the NCAA, we conclude that Bloom had standing in a preliminary injunction hearing to contest the meaning or applicability of NCAA eligibility restrictions. *See Hall v. NCAA*, 985 F.Supp. 782, 796–97 (N.D.Ill.1997)(given importance of NCAA's function to benefit student-athletes, and NCAA's role in determining eligibility of student-athletes, court assumed student-athlete was likely to succeed in proving third-party beneficiary standing vis-a-vis the contract between the NCAA and its members); *see also NCAA v. Brinkworth*, 680 So.2d 1081, 1083 (Fla.Dist.Ct.App.1996).

With respect to a claim of arbitrary and capricious action, the Kentucky Supreme Court observed that "relief from our judicial system should be available if voluntary athletic associations act arbitrarily and capriciously toward student-athletes." *NCAA v. Lasege*, 53 S.W.3d 77, 83 (Ky.2001). The basis upon which the court made that observation, however, is not altogether clear.

There is some suggestion in *Lasege* that judicial review was justified because the NCAA occupied the role of a quasi-state actor with respect to individual student-athletes. *See NCAA v. Lasege, supra*, 53 S.W.3d at 83 n. 9 (analogizing the NCAA and a state high school athletic association). However, in an analogous circumstance, the United States Supreme Court concluded that the NCAA is not a state actor and that a state university's adherence to NCAA rules does not implicate the "state action" necessary to trigger a civil rights claim. *See NCAA v. Tarkanian*, 488 U.S. 179, 195, 109 S.Ct. 454, 463–64, 102 L.Ed.2d 469 (1988)(concerning coach, not student-athlete); *see also Matthews v. NCAA*, 79 F.Supp.2d 1199, 1207 (E.D.Wash.1999)(NCAA not a state actor, for purposes of assessing student-athlete's due process claim contesting NCAA's eligibility determination).

Courts are reluctant to intervene, except on the most limited grounds, in the internal affairs of voluntary associations. *See, e.g., Jorgensen Realty, Inc. v. Box*, 701 P.2d 1256, 1258 (Colo.App.1985); *Van Valkenburg v. Liberty Lodge No. 300*, 9 Neb.App. 782, 619 N.W.2d 604, 607 (2000). Even then, it would appear that a plaintiff must ordinarily allege an invasion of some type of civil or property right to have standing. *See Van Valkenburg v. Liberty Lodge No. 300, supra*, 619 N.W.2d at 609; *see also Levant v. Whitley*, 755 A.2d 1036, 1043–44 n. 11 (D.C.2000)(surveying circumstances in which courts intervene in disputes involving voluntary membership associations).

Here, Bloom is not a member of the NCAA, and he does not have a constitutional right to engage in amateur intercollegiate athletics at CU. *See, e.g., Graham v. NCAA*, 804 F.2d 953, 955 (6th Cir.1986); *Colo. Seminary (Univ. of Denver) v. NCAA*, 570 F.2d 320, 321 (10th Cir.1978); *Hart v. NCAA*, 209 W.Va. 543, 550 S.E.2d 79, 86 (2001). Nor does he assert any property interest in playing football for CU.

However, to the extent Bloom's claim of arbitrary and capricious action asserts a violation of the duty of good faith and fair dealing that is implied in the contractual relationship between the NCAA and its members, his position as a third-party beneficiary of that contractual relationship affords him standing to pursue this claim. *See O'Reilly v. Physicians Mut. Ins. Co.*, 992 P.2d 644, 646 (Colo.App.1999)(implied duty of good faith and fair dealing requires "parties to the agreement to perform their contractual obligations in good faith and in a reasonable manner"); *see also Hall v. NCAA, supra*, 985 F.Supp. at 784 (implied duty of good faith and fair dealing "requires that a party vested with contractual discretion exercise that discretion reasonably, not arbitrarily or capriciously"); *Dayan v. McDonald's Corp.*, 125 Ill.App.3d 972, 991, 81 Ill.Dec. 156, 466 N.E.2d 958, 972 (1984)(implied duty to deal fairly and in good faith requires party vested with discretion to act reasonably and not "arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties").

In sum, we conclude that Bloom has third-party beneficiary standing to pursue what in essence are two claims for violation of his contractual rights.

## V. Probability of Success

Bloom contends that the trial court erred in assessing the probability of success on his contract claims. We disagree.

Initially, we note that, as a third-party beneficiary, Bloom has rights no greater than those of the parties to the contract itself, here, the NCAA and its member institutions. *See United Steelworkers v. Rawson*, 495 U.S. 362, 363, 110 S.Ct. 1904, 1906, 109 L.Ed.2d 362 (1990).

### A. Interpretation of NCAA Bylaws

In interpreting a contract, we seek to give effect to the intent and the reasonable expectations of the parties. *Thompson v. Maryland Cas. Co.*, 84 P.3d 496, 501 (Colo.2004). To determine the intent and expectations of the parties, we view the contract in its entirety, not in isolated portions, *Colowyo Coal Co. v. City of Colorado Springs*, 879 P.2d 438, 445 (Colo.App.1994), and we give words and phrases their plain meaning according to common usage. *See Nat'l Propane Corp. v. Miller*, 18 P.3d 782, 786 (Colo.App.2000); *see also Truck Ins. Exch. v. Eagle River Water & Sanitation Dist.*, 17 P.3d 844, 845–46 (Colo.App.2000).

If its meaning is clear and unambiguous, the contract is enforced as written. *Kaiser v. Mkt. Square Disc. Liquors, Inc.*, 992 P.2d 636, 640 (Colo.App.1999). If, however, the contract is susceptible of more than one reasonable interpretation, it is ambiguous, and its meaning must be determined as an issue of fact. *Ad Two, Inc. v. City & County of Denver*, 9 P.3d 373, 376 (Colo.2000). In resolving an ambiguity, a court will follow the construction placed upon it by the parties themselves before the controversy arose. *See Tucker v. Ellbogen*, 793 P.2d 592, 596 (Colo.App.1989); *cf. Centennial Enters., Inc. v. Mansfield Dev. Co.*, 193 Colo. 463, 465, 568 P.2d 50, 52 (1977)(court will not construe ambiguous language against one party where that party was not exclusively responsible for drafting the language).

The interpretation of a contract and the determination whether it is ambiguous are questions of law subject to de novo review by this court. *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo.1996).

Bloom relies on NCAA Bylaw 12.1.2, which states that "[a] professional athlete in one sport may represent a member institution in a different sport." He asserts that, because a professional is one who "gets paid" for a sport, a student-athlete is entitled to earn whatever income is customary for his or her professional sport, which, in the case of professional skiers, primarily comes from endorsements and paid media opportunities.

We recognize that, like many others involved in individual professional sports such as golf, tennis, and boxing, professional skiers obtain much of their income from sponsors. We note, however, that none of the NCAA's bylaws mentions, much less explicitly establishes, a right to receive "customary income" for a sport.

To the contrary, the NCAA bylaws prohibit every student-athlete from receiving money for advertisements and endorsements. In this regard, NCAA Bylaw 12.5.2.1 states:

> Subsequent to becoming a student-athlete, an individual shall not be eligible for participation in intercollegiate athletics if the individual: (a) Accepts any remuneration for or permits the use of his or her name or picture to advertise, recommend or promote directly the sale or use of a commercial product or service of any kind, or (b) Receives remuneration for endorsing a commercial product or service through the individual's use of such product or service.

Additionally, while NCAA Bylaw 12.5.1.3 permits a student-athlete to continue to receive remuneration for activity initiated prior to enrollment in which his or her name or picture is used, this remuneration is only allowed, if, as pertinent here, "the individual became involved in such activities for reasons independent of athletics ability; ... no reference is made in these activities to the individual's name or involvement in intercollegiate athletics; [and] ... the individual does not endorse the commercial product."

Further, NCAA Bylaw 12.4.1.1 prohibits a student-athlete from receiving "any remuneration for value or utility that the student-athlete may have for the employer because of

the publicity, reputation, fame or personal following that he or she has obtained because of athletics ability."

Unlike other NCAA bylaws, the endorsements and media appearance bylaws do not contain any sport-specific qualifiers. *See, e.g.,* NCAA Bylaw 12.3.1 (ineligibility of student-athlete to compete in intercollegiate sport based on agreement with agent to market athlete's athletic ability or reputation "in that sport").

■ In our view, when read together, the NCAA bylaws express a clear and unambiguous intent to prohibit student-athletes from engaging in endorsements and paid media appearances, without regard to: (1) when the opportunity for such activities originated; (2) whether the opportunity arose or exists for reasons unrelated to participation in an amateur sport; and (3) whether income derived from the opportunity is customary for any particular professional sport.

The clear import of the bylaws is that, although student-athletes have the right to be professional athletes, they do not have the right to simultaneously engage in endorsement or paid media activity and maintain their eligibility to participate in amateur competition. And we may not disregard the clear meaning of the bylaws simply because they may disproportionately affect those who participate in individual professional sports.

Further, the record contains ample evidence supporting the trial court's conclusion that this interpretation is consistent with both the NCAA's and its member institutions' construction of the bylaws. An NCAA official testified that both the endorsement and media appearance provisions have been consistently applied and interpreted in a nonsport-specific manner. Indeed, another NCAA official related that association members had resisted efforts to change the endorsement rule to be sport-specific. Although the evidence is conflicting, the record supports the trial court's conclusion that, from the beginning, CU understood that the endorsement and media activity rules were nonsport-specific in scope.

Thus, even if the bylaws were viewed as ambiguous, the record supports the trial court's conclusion that the bylaws would ultimately be interpreted in accordance with the NCAA's and its member institutions' construction of those bylaws.

## B. Application of Bylaws to Bloom

The United States Supreme Court has recognized the NCAA as "the guardian of an important American tradition," namely, amateurism in intercollegiate athletics. *See NCAA v. Bd. of Regents,* 468 U.S. 85, 101, 104 S.Ct. 2948, 2960, 82 L.Ed.2d 70 (1984).

Under that tradition, "college sports provided an important opportunity for teaching people about character, motivation, endurance, loyalty, and the attainment of one's personal best—all qualities of great value in citizens. In this sense, competitive athletics were viewed as an extracurricular activity, justified by the university as part of its ideal objective of educating the whole person." James J. Duderstadt, *Intercollegiate Athletics and the American University* 70 (Univ. Mich. Press 2003).

The NCAA's "Principle of Amateurism" states:

> Student-athletes shall be amateurs in an intercollegiate sport, and their participation should be motivated primarily by education and by the physical, mental and social benefits to be derived. Student participation in intercollegiate athletics is an avocation, and student-athletes should be protected from exploitation by professional and commercial enterprises.

NCAA Const. art. 2.9.

The NCAA's purpose, in this regard, is not only "to maintain intercollegiate athletics as an integral part of the educational program," but also to "retain a clear line of demarcation between intercollegiate athletics and professional sports." NCAA Const. art. 1, § 1.3.1.

Here, the trial court found that application of the endorsement and media appearance rules in Bloom's case was rationally related to the legitimate purpose of retaining the "clear line of demarcation between intercollegiate athletics and professional sports."

The trial court noted that salaries and bonuses are an acceptable means for attain-

ing income from professional sports, but endorsement income is not acceptable if a student-athlete wishes to preserve amateur eligibility. According to NCAA officials: (1) endorsements invoke concerns about "the commercial exploitation of student-athletes and the promotion of commercial products"; and (2) it is not possible to distinguish the precise capacity in which endorsements are made. A CU official related that generally, the endorsement rule prevents students from becoming billboards for commercialism, and in Bloom's case, there would "be no way to tell whether he is receiving pay commensurate with his ... football ability or skiing ability."

In this respect, the trial court observed:

In an honest world where there is no attempt to avoid an ideal, there wouldn't be an impact on amateurism if Mr. Bloom was allowed to be compensated as is customary for professional skiers; however, it's naïve to think that we live in such a world. There are those who would be less than honest and seek profit for profit's sake....

If Mr. Bloom was allowed to receive the [endorsement] income that is customary for professional skiers, it is not difficult for me to imagine that some in other professional sports would decide that in addition to direct monetary compensation ... endorsements or promotion of goods would become customary.

Similar concerns underlie the NCAA's prohibition on paid entertainment activity. Paid entertainment activity may impinge upon the amateur ideal if the opportunity were obtained or advanced because of the student's athletic ability or prestige, even though that activity may further the education of student-athletes such as Bloom, a communications major. As the trial court noted, there are "various shades of gray within which such events could fall." And, as should be evident, the NCAA does not prohibit *unpaid* internships, externships, or other educational opportunities in the entertainment field.

In this case, Bloom presented evidence that some of his acting opportunities arose not as a result of his athletic ability but because of his good looks and on-camera presence. However, the record contains evidence that Bloom's agent and the Tommy Hilfiger company marketed Bloom as a talented multi-sport athlete, and a representative from a talent agency intimated that Bloom's reputation as an athlete would be advantageous in obtaining auditions for various entertainment opportunities. Further, the NCAA indicated, when asked to interpret its rules, that it was unable, due to insufficient information, to determine which of Bloom's requested media activities were, in fact, unrelated to his athletic ability or prestige.

Under these circumstances, we perceive no abuse of the trial court's discretion in failing to fault the NCAA for refusing to waive its rules, as requested by CU, to permit Bloom "to pursue any television and film opportunities while he is a student-athlete at CU." *See Cole v. NCAA*, 120 F.Supp.2d 1060, 1071–72 (N.D.Ga.2000)(NCAA decisions regarding "challenges of student-athletes are entitled to considerable deference," and courts are reluctant to replace the NCAA as the "decision-maker on private waiver applications"); *see also NCAA v. Lasege, supra*, 53 S.W.3d at 83 (voluntary athletic associations "should be allowed to 'paddle their own canoe' without unwarranted interference from the courts").

Bloom also asserts that the NCAA is arbitrary in its application of the endorsement and media bylaws. He notes that, while the NCAA would bar him from accepting commercial endorsements, it will allow colleges to commercially endorse athletic equipment by having students wear the equipment, with identifying logos and insignias, while engaged in intercollegiate competition. But the trial court determined, and we agree, that this application of the bylaws has a rational basis in economic necessity: financial benefits inure not to any single student-athlete but to member schools and thus to all student-athletes, including those who participate in programs that generate no revenue.

Bloom further argues that the NCAA is arbitrary in the way it applies its bylaws among individual students. Bloom presented evidence that, in one instance, a student-athlete was permitted to make an unpaid,

minor appearance in a single film. But the NCAA could rationally conclude that this situation was different: Bloom did not seek permission to make an unpaid appearance in one specific instance; he wanted to take advantage of any number of television and film opportunities, and he wanted to be paid. Bloom also presented evidence that a second student-athlete was permitted to appear on television while he participated in his professional sport. But Bloom did not show that the NCAA would prohibit him from appearing on television while participating in his professional sport.

In a "supplemental authority" filed with this court under C.A.R. 28(j) before oral argument, Bloom presented us with new evidence relating to the NCAA's treatment of the second student-athlete. Because this evidence was never presented to the trial court, however, we may not now consider it. *See Petition of Edilson*, 637 P.2d 362, 364 (Colo.1981)("Evidence which was not presented to the trial court will not be considered on review."); *In re Marriage of Hunt*, 868 P.2d 1140, 1143 (Colo.App.1993)(appellate court may not consider evidence offered for the first time on appeal), *aff'd*, 909 P.2d 525 (Colo.1995); *see also Ministry of Def. of Iran v. Gould Mktg., Inc.*, 969 F.2d 764, 773 (9th Cir.1992)(under similar version of Fed. R.App. P. 28(j), party was permitted to bring to appellate court's attention new legal authorities, not bring in new evidence on appeal).

Bloom has thus failed to demonstrate any inconsistency in application which would lead us to conclude that the NCAA was arbitrarily applying its rules.

Finally, we are not convinced that the NCAA treated Bloom unfairly in the manner in which it denied the requests to waive or interpret its rules.

Although Bloom is correct that he was not permitted to personally petition the NCAA, he effectively submitted three petitions to the NCAA with the full assistance and support of CU. The trial court's finding that Bloom had "an ability to fully present his ... position through the membership institution" is amply supported by the record.

Further, the court found, with record support, that the NCAA requested additional information on CU's petition (evidencing that the NCAA was not acting arbitrarily or capriciously), and that there was no evidence that the NCAA gave CU's petition any less consideration than its other "hundreds of administrative and waiver requests."

The record thus supports the trial court's findings that the NCAA's administrative review process is reasonable in general and that it was reasonably applied in this case. As such, these findings, as well as those with respect to the NCAA's application of its bylaws, are not manifestly arbitrary, unreasonable, or unfair. *See Bd. of County Comm'rs v. Fixed Base Operators, Inc.*, *supra*, 939 P.2d at 467.

For these reasons, we agree with the trial court that Bloom failed to demonstrate a reasonable probability of success on the merits.

## VI. Other Issues

As noted earlier, to obtain a preliminary injunction, Bloom had to satisfy every part of the *Rathke v. MacFarlane* test. Because he failed to satisfy the part requiring a reasonable probability of success on the merits, Bloom was not entitled to a preliminary injunction. *See Atmel Corp. v. Vitesse Semiconductor Corp.*, *supra*, 30 P.3d at 796 (because a reasonable probability of success on the merits had not been met, entry of the preliminary injunction was error).

In light of this conclusion, we need not address whether, as the trial court found, Bloom also failed to show that a preliminary injunction would not disserve the public interest and was justified by the balance of equities in the case. Consequently, we do not address the parties' remaining arguments, including the validity of the NCAA's restitution rule, NCAA Bylaw 19.8, or the effect, if any, of the federal Commerce Clause on the trial court's ability to fashion a remedy for Bloom in this case.

Accordingly, the trial court's order is affirmed.

Judge VOGT and Judge RUSSEL concur.