Cad P. THURMAN, Commissioner of Insurance of the Commonwealth of Kentucky, and Department of Insurance of the Commonwealth of Kentucky, Appellant,

v.

MERIDIAN MUTUAL INSURANCE COMPANY, Appellee.

Court of Appeals of Kentucky.

March 17, 1961.

J. D. Ackman, Louisville and Scott Reed, Lexington, for appellant.

Joseph J. Leary, Frankfort, for appellee.

PALMORE, Judge.

In July 1957 the appellee, Meridian Mutual Insurance Company, pursuant to KRS 304.606 applied to the appellant, as Commissioner of Insurance of this state, for authority to charge for certain types of insurance lower rates than those set forth in the approved schedules theretofore filed by the insurance rating bureaus of which Meridian is a subscriber or member. The application was denied and on appeal the Franklin Circuit Court on March 21, 1959, set aside the administrative order and directed the Commissioner to permit a 10% downward deviation. The Commissioner appeals.

Since a deviation permitted under KRS 304.606 is effective only for one year and

the appellee evidently has charged the lower rates during this litigation pursuant to a stay order entered by the circuit court, the controversy appears to be moot. Nevertheless, we shall dispose of it on the merits because it involves a fundamental problem of first impression in this jurisdiction.

The scope of judicial review in this case is governed by KRS 304.052. Findings of fact made by the Commissioner are conclusive if supported by substantial evidence. His exercise of discretionary judgment stands unless we find it to be arbitrary and unreasonable.

The statutes principally under consideration are KRS 304.600, 304.602, and 304.606, which vary but slightly from the form in which they were first enacted by Chapter 99, Acts of 1946. The legislation of which they are component parts was patterned after model rate regulation laws suggested by the National Association of Insurance Commissioners, together with an All-Industry Committee, in an effort to promote uniformity of state regulation following the enactment by Congress of the McCarran Act, Public Law 15, 59 Stat. 33 (1945), 15 U.S.C.A. § 1011 et seq. Precipitated by United States v. South-Eastern Underwriters Ass'n, 1944, 322 U.S. 533, 64 S.Ct. 1162, 1164, 88 L.Ed. 1440, wherein the Supreme Court held the Commerce Clause, Const. art. 1, § 8, cl. 3 and the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, applicable to "insurance transactions stretching across state lines," the purpose of the McCarran Act was to remove the business of insurance from the application of the antitrust laws where it is covered by effective state regulation. See Dirlam and Stelzer, The Insurance Industry: A Case Study in the Workability of Regulated Competition, 107 Pa.L.Rev. 199 (1958).

KRS 304.600 provides that the purpose of the law "is to promote the public welfare by regulating insurance rates to the end that they shall not be excessive, inadequate or unfairly discriminatory, and to authorize and regulate cooperative action among insurers in rate making" and in other pertinent matters, but that it is not intended "to prohibit or discourage reasonable competition, or to prohibit, or encourage, except to the extent necessary to accomplish the purpose stated, uniformity in insurance rates * * *."

Again it is stated in KRS 304.602 that rates shall not be "excessive, inadequate or unfairly discriminatory," and that "uniformity among insurers * * * is neither required nor prohibited" except as necessitated by the considerations therein specified as mandatory in rate making, which are: (1) past and prospective loss experience within and outside this state; (2) the conflagration and catastrophe hazards; (3) a reasonable margin for underwriting profit and contingencies; (4) dividends, savings and unabsorbed premium deposits allowed or returned by insurers to the policyholders, members or subscribers; (5) past and prospective expenses both countrywide and those applicable to this state; (6) all other relevant factors within and outside this state; and, (7) in the case of fire insurance, experience of the fire insurance business for not less than the most recent 5–year period for which such experience is available.

There are three avenues by which an insurer may secure authority for its rates, (a) by independent filing under KRS 304.-603, (b) by adherence to rates filed under KRS 304.604 by a rating organization of which the insurer is a member or subscriber, and (c) by the latter method with modifications or deviations as permitted by KRS 304.606. The last of these is the procedure with which we are now concerned.

KRS 304.606 provides that a member of or subscriber to a rating organization shall adhere to the rate filings made on its behalf by such organization except that it may apply to the Commissioner for permission to file deviations. In considering such application the Commissioner is enjoined to

consider "the available statistics and the principles for rate-making as provided in KRS 304.602," and to deny the application "if he finds that the resulting premiums would be excessive, inadequate or unfairly discriminatory."

Meridian Mutual Insurance Company came into being on January 1, 1953, as the consolidated successor of three Indiana insurance companies, Farmers Mutual Liability Company, Conservative Mutual Insurance Company, and Farmers National Mutual Insurance Company. Theretofore Farmers Mutual had written principally general casualty insurance, and no fire and allied coverage, whereas the business of the other two companies was confined exclusively to fire and allied lines. Statistics introduced in this proceeding related entirely to Meridian and its principal predecessor, Farmers Mutual, and therefore did not show any fire and allied experience prior to 1953. The company now operates in Indiana, Michigan, Kentucky and South Carolina. Its first year of business in Kentucky was 1955.

The company is a subscriber to the Kentucky Inspection Bureau for fire and allied lines and a member of the Transportation Insurance Rating Bureau for homeowners' policies, personal property floater coverage, and other classes of inland marine insurance. In this proceeding it applied, with certain exceptions, for downward deviations of 15% from the fire and allied rates and 10% from the homeowners' and personal property floater "loading" rates theretofore established by the respective rating bureaus. In each of the years 1955 to 1957 it had been granted similar deviations except that the deviation on fire and allied lines was 10%. Though a mutual company, its policy is not to pay dividends, but to "operate on the deviation plan," meaning, of course, lower rates than other companies. The 10% deviation permitted in Kentucky since 1955 had been in force in Indiana for several years, and in 1957 the further deviation to 15% on fire and allied lines was allowed in Indiana

and Michigan. By denial of the application in question the Commissioner refused to continue or extend the company's authority to use deviated rates in Kentucky. The action of the Franklin Circuit Court on appeal directed allowance of 10% deviations, being the same as the Commissioner had permitted theretofore.

In supporting its application the company presented a number of statistical exhibits showing its steady growth and sound financial condition. As of the end of 1956, out of assets totalling $9,964,970 it had a surplus (excluding voluntary reserves) of $3,875,527. Total premiums written in recent years have increased from $5,750,-840 in 1953 to $7,429,847 in 1956 and $4,642,-342 for the first half of 1957, resulting in a reduction of underwriting expense per policy. On the other hand, these exhibits indicate a downward trend in net underwriting gain (that is, the profit from sale of insurance as distinct from investment and other income) and ratio of underwriting gain to earned premiums as follows:

| Year | Gain | Ratio |
|------|------|-------|
| 1953 | $456,572 | |
| 1954 | $876,790 | 15.4% |
| 1955 | $143,931 | 2.4% |
| 1956 | $100,479 | 1.5% |

And an exhibit filed by the Department of Insurance (with the company's consent) subsequent to the hearing, but not mentioned in the Commissioner's written opinion, shows that for the year 1957, with earned premiums of $8,162,293, the company experienced a net underwriting loss of $372,196. offset by investment income of $180,042, resulting in a $189,757 decrease in surplus. Other exhibits presented by the company show that for the 4-year period of 1953 through 1956 the company achieved an underwriting gain of 7.53%, which would have been 16.55% had the premiums been based on the bureau rates.

The figures we have mentioned here represent the company's total business. It is conceded that its experience in Kentucky

has not yet reached sufficient proportions to have probative value for the purpose at hand. For example, premiums written in Kentucky during the first half of 1957 amounted to $193,705, or 4.17% of the total, out of which only $8,293 represented fire and allied lines, $1,337 homeowners', and $471 inland marine.

In his written opinion the Commissioner analyzed the company's proof against each of the considerations set forth in KRS 304.602 and, in effect, found it wanting in the following respects:

(1) Its fire and allied lines experience countrywide and in this state was insufficient in volume and duration to constitute supporting data as envisioned by the statute.

(2) There was no evidence as to the conflagration and catastrophe hazards.

(3) The materially downward trend recently experienced in underwriting gain, at a lesser deviation than the one now sought, indicated the absence of a reasonable margin for underwriting profits and contingencies.

(4) Past and prospective expenses, countrywide and in this state, did not support the proposed deviation. because (a) 94% of the company's total premiums (and, therefore, its supporting statistics) were derived from business in Indiana where, inter alia, it was not subject to the 2¾% tax applicable to it in Kentucky as a foreign insurer. (b) 86% of the company's business consisted of automobile insurance as distinguished from the types of coverage under consideration, with the result that its overall statistics did not accurately reflect its experience in the latter, and (c) in his annual report to the directors in May 1957 the president of the company stated that business had not yet reached the break-even point in Kentucky, costs were up about 18½% over the same quarter of the previous year, and "the present rate level may not be adequate for the year."

He then considered whether, in spite of the foregoing inadequacies, the company's countrywide underwriting results during the past 5 years entitled it to the deviations sought, and concluded that they did not. He took the position that since the company had availed itself of the services of the rating bureaus it was incumbent on it to show wherein the statistical factors on which its proposed rates were based differed from the comparable factors used by those rating bureaus (presumably to prove the bureau rates unreasonable as to the company).

■ The company contends that the bureau rates, including the factors on which they are based, are already established as fundamentally reasonable and that in order to support deviations therefrom the degree of statistical exactitude required for independent filings is not necessary, particularly where there is a strong showing of the company's solvency and financial stability, the experience and skill of its management, the prudence of its policies, its long record of growth and prosperity, the soundness of its basic approaches to the matter of rates, and its ability to operate at the lower rates. These arguments reach the heart of the problem, and although for the reasons hereinafter stated we must uphold the Commissioner's action, we find ourselves in agreement with the basic tenet of the company's position, which is that an insurer's solvency is a dominating consideration in the regulation of its rates, and that a rate structure is "adequate" if the insurer is "financially able to furnish sound insurance and to meet its obligations." Cf. Richards on Insurance, Vol. I, pp. 147, 220 (footnote).

The purpose of the statutes authorizing independent filings and deviations from bureau classifications is to preserve some measure of rate competition. Overemphasis on uniformity of rates through a restrictive policy toward deviations tends, of course, to stifle competition. Granting the desirability of public regulation in the field of insurance, there is very little real danger that free competition will be "ruinous"

where the financial integrity of the respective insurers is kept under close and periodic scrutiny by a public agency. This certainly is accomplished by the requirement that deviated rates be applied for and justified annually.

Here we have a foreign insurer whose bread and butter business is automobile insurance. It seeks to extend and expand its volume in certain other lines of coverage. The method it chooses for this purpose is price competition and conservative selection of policyholders. Perhaps for a time this phase of its operations may not be profitable and must be carried by the earnings and surplus realized from the staple automobile insurance business. But is this not a normal and traditional process of the free enterprise system? We think so. The company seeks in this case only to charge the same rates it has in effect in Indiana, where its principal business is done. It is not a case of cutting prices in a selected area to secure business by unfair competition. Other companies are free to respond similarly, subject only to the same safeguarding supervision of the Commissioner. We conclude, therefore, that in requiring of the company substantially the same sort of proof essential to support an independent filing or, in the alternative, a comparative analysis of its own rating factors and statistics against those of the rating bureaus, the Commissioner imposed a criterion not in keeping with the preservation of reasonable competition as contemplated by the statutes in question.

Returning now to the permissible scope of judicial review, bear in mind that the exercise of discretionary power by the Commissioner, though resting ultimately on opinion as distinguished from pure fact, represents a factual finding and is not to be disturbed unless it is arbitrary or unreasonable. By "arbitrary" we mean clearly erroneous, and by "clearly erroneous" we mean unsupported by substantial evidence. By "unreasonable" is meant that under the evidence presented there is no room for difference of opinion among reasonable minds.

Within the foregoing definitions we cannot say that the Commissioner's action in denying the application was arbitrary and unreasonable. He noted that under its existing rates, including 10% deviations on the minor segment of its business represented by the lines in question, the company's underwriting gain had fallen to 1.5%, and his apprehension in this respect was confirmed by the net underwriting loss of $372,196 experienced in 1957. True, the president of the company sought to mitigate the force of this circumstance by testifying that rapid increases in premium volume temporarily reflect an exaggerated expense ratio (e. g., premiums are treated as "earned" over the term of the policy, whereas the expenses of underwriting, such as agents' commissions, are charged off immediately), yet we consider this matter within the area of reasonable difference of opinion. We are not insurance experts, and we cannot properly substitute our judgment for that of the Commissioner. He had room to conclude that the company's rates did not provide a reasonable margin for underwriting gains and contingencies, which in turn might eventually impair its financial security. Regardless of what its accumulated surplus may have been, he was not obliged to approve the further use of deviated rates if he had any reasonable grounds under the evidence to suspect that a net loss in the company's operations was imminent. In such circumstances he was, in effect, not satisfied that under the company's existing rate structure it would continue to be "financially able to furnish sound insurance and to meet its obligations," and the evidence does not convince us that his judgment was manifestly unreasonable.

To its brief the company has appended an exhibit showing very favorable results for the period between May 31, 1958, and May 31, 1959. This information was not before the Commissioner, and any consideration of it here would arrogate to this court a

quasi-trial function it does not possess. It would, of course, be appropriate to proceedings before the Commissioner involving subsequent fiscal periods.

The judgment of the Franklin Circuit Court is reversed with directions that the order of the Commissioner be sustained.

MONTGOMERY, J., dissents on the ground that the proposed deviations pose no real or immediate threat to the company's solvency.