NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Movant,

v.

**Muhammed LASEGE and University of Louisville, Respondents.**

No. 2001–SC–0114–I.

Supreme Court of Kentucky.

June 14, 2001.

## OPINION AND ORDER GRANTING MOTION FOR CR 65.09 RELIEF

KELLER, Justice.

## I. INTRODUCTION

The National Collegiate Athletic Association ("NCAA")[1] moves this Court for interlocutory relief under CR 65.09 and asks us to vacate the Jefferson Circuit Court's temporary injunction which (1) declares Respondent Lasege eligible to participate in NCAA intercollegiate basketball and (2) prohibits the NCAA from imposing future sanctions against Lasege or Respondent University of Louisville ("U of L") pursuant to its NCAA Bylaw 19.8 restitutionary powers. We find that the NCAA has demonstrated "extraordinary cause" justifying CR 65.09 relief and we vacate the temporary injunction in its entirety.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Lasege, a citizen of Nigeria, a country in West Africa, enrolled at the University of Louisville during the 1999–2000 academic year with the intention of playing for its intercollegiate men's basketball team. In March 2000, U of L declared Lasege ineligible to play intercollegiate basketball because he had previously entered into professional basketball contracts and had received preferential benefits which compromised his amateur status. U of L asked the NCAA to reinstate Lasege's eligibility because of Lasege's ignorance of NCAA regulations and other mitigating factors. The NCAA's Student–Athlete Reinstatement Staff ("Staff") found that Lasege had violated its Bylaws relating to contracts and compensation,[2] the use of agents,[3] and preferential treatment, benefits, or services,[4] and declined U of L's rein-

---

1. The NCAA is a voluntary association of approximately 1,200 public and private colleges and universities, conferences, organizations and individuals which have joined together for purposes of administering and regulating intercollegiate athletic competition.

2. *See* NCAA Division I Bylaws § 12.2.5.1 (Contracts and Compensation—General Rule):

    An individual shall be ineligible for participation in an intercollegiate sport if he or she has entered into any kind of agreement to compete in professional athletics, either orally or in writing, regardless of the legal enforceability of that agreement.
    *Id.*

3. *See* NCAA Division I Bylaws § 12.3.1 (Use of Agents—General Rule):

    An individual shall be ineligible for participation in an intercollegiate sport if he or she ever has agreed (orally or in writing) to be represented by an agent for the purpose of marketing his or her athletics ability or reputation in that sport. . . .
    *Id.*

4. *See* NCAA Division I Bylaws § 12.1.1 (Amateur Status):

    An individual loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual:
    (a) Uses his or her athletics skill (directly or indirectly) for pay in any form in that sport;
    *Id.;* NCAA Division I Bylaws § 12.1.1.1 (Prohibited Forms of Pay) & § 12.1.1.1.6 (Prefer-

statement request "[b]ased on the case precedent and the subcommittee's December 1999 amateurism guidelines involving contracts and professional teams. Specifically, the Staff focused on [Lasege's] decisions to sign explicit contracts with a sports agent and a professional team." The NCAA described the factual basis for its findings as follows:

Prior to enrollment, SA [Student Athlete] asserts he left his home in Nigeria to go to Russia in order to obtain a visa to come to the U.S. so that SA could go to school. SA was provided with an airline ticket ($800) to Russia from Nigeria by the Russian Sports Agency, New Sport. While in Russia, SA signed a contract with New Sport in Russia to represent SA regarding playing basketball for the professional club system in Moscow. As a result of the New Sport three-year contract, SA was to receive a salary of $9,000 a year with additional monetary incentives based on athletic performance. SA asserts he did not receive a salary but did receive living accommodations and meals for approximately 18 months valued at $1,170. SA was provided a driver, a cook, a visa to Russia ($70), clothing ($75) and a round-trip ticket from Moscow to Nigeria ($798). SA signed a second contract with a professional basketball team, which was to provide SA with a salary, furnished apartment, utilities but no telephone, two round-trip airline tickets to return to Nigeria and a car for personal needs if SA should obtain a Russian driver's license. SA asserts he did not receive a salary from the second contract. SA competed with two junior teams in 13 contests. One of the teams was a junior team of the professional team SA signed the second contract with, and both junior teams were finan-

cially supported by professional teams. SA practiced with two professional teams but did not compete. SA was provided an airline ticket ($750) and visa ($50) to Canada from Moscow by an individual in Canada who knew of SA due to his athletics ability, which constituted a violation of 12.1.1.6. This individual provided SA with lodging and meals ($2,000) for approximately eight months. Individual also provided SA with automobile transportation to and lodging while at institution for an unofficial visit ($342.50), airline tickets, meals and lodging at another collegiate institution for an unofficial visit ($538) and a one-way airline ticket to institution for initial college enrollment ($101.50) for the 1999–00 academic year.

U of L appealed the Staff's decision to the NCAA's Division I Subcommittee on Student–Athlete Reinstatement. The Subcommittee, which consists of representatives from NCAA Division I member institutions, found that Lasege's Bylaw violations exhibited a clear intent to professionalize and affirmed the Staff's decision denying reinstatement.

On November 27, 2000, Lasege filed a Motion and Complaint in Jefferson Circuit Court seeking a temporary injunction requiring the NCAA to reverse its decision as to U of L's request and to immediately reinstate his eligibility to play basketball at U of L. After conducting an evidentiary hearing, the trial court found that the complaint presented a substantial question as to whether the NCAA's ruling was arbitrary and capricious. Specifically, the trial court: (1) suggested that the NCAA had ignored what it described as "overwhelming and mitigating circumstances," including economic and cultural disadvantages, a complete ignorance of NCAA regulations,

ential Treatment, Benefits, or Services) (defin-          ing "pay" as used in § 12.1.1).

and elements of coercion associated with execution of the contracts; (2) believed the NCAA's determination to conflict with the NCAA's own amateurism guidelines and past eligibility determinations regarding athletes who had engaged in similar violations; (3) expressed its doubts about whether the first contract signed by Lasege was legally enforceable as an agency contract both because of Lasege's minority at the time he executed it and because the trial court disputed that the contract created an agency relationship; and (4) opined that a clear weight of evidence suggested Lasege committed these violations not in order to become a professional athlete, but only to obtain a visa which would allow him to become a student-athlete in the United States.

The trial court found that Lasege would suffer substantial collateral consequences from an erroneous and adverse eligibility determination, balanced the equities in favor of Lasege, and ordered "the NCAA and its members ... to immediately restore the intercollegiate eligibility of Muhammed Lasege so as to allow him to participate in all NCAA basketball contests." The trial court also addressed U of L's concern that the NCAA could impose sanctions under NCAA Bylaw 19.8 if the injunction was subsequently vacated. NCAA Bylaw 19.8 allows the NCAA to seek restitution from member institutions who permit student-athletes found ineligible by the NCAA to compete for their athletic teams pursuant to court orders which are later vacated.[5] The trial court therefore "declare[d] that NCAA Bylaw 19.8 is invalid because it prevents parties from availing themselves of the protections of the courts" and ordered:

... that the University of Louisville shall abide by this injunction and shall not prohibit Muhammed Lasege from engaging in intercollegiate basketball;

IT IS FURTHER ORDERED AND ADJUDGED that the NCAA and its members are hereby ordered to take no action to prevent or interfere with the University of Louisville's ability to abide by this Order by attempting to enforce NCAA Bylaw 19.8.

After the trial court entered the temporary injunction, Lasege played basketball for U of L during the 2000–2001 season.

While Lasege played, the NCAA sought interlocutory relief under CR 65.07, but the Court of Appeals found the trial court's findings supported by substantial evidence and denied the NCAA's motion. The Court of Appeals did not address the merits of that portion of the temporary injunction which prohibited the NCAA from seeking restitution under NCAA Bylaw 19.8 because "[a]pplication of the bylaw becomes an issue in this case only in the event that the injunction were to be set aside or a permanent injunction were denied in this matter."

The NCAA thus seeks interlocutory relief from this Court.

### III. DISCUSSION

#### III(A)—STANDARD OF REVIEW

Cases involving challenges to eligibility decisions made by voluntary athletic associations such as the Kentucky High School Athletic Association ("KHSAA") or, as in this case, the NCAA, pose special difficulties for our circuit courts. Such cases are invariably time-sensitive as they are typically filed in the midst of an athletic season, often on the cusp of postseason com-

---

5. NCAA Division I Bylaws § 19.8 (Restitution) (reproduced in full in the Appendix to this Opinion and Order).

petition. Because athletic seasons are usually completed before either a final decision on the merits by the trial court or appellate review, a circuit court's ruling granting or denying a temporary injunction will typically, as a practical matter, decide the issue of whether a student-athlete competes. In *KHSAA v. Hopkins Co. Board of Education*,[6] the Court of Appeals recognized the inherent limitations courts face in such determinations:

> This case demonstrates that courts are a very poor place in which to conduct interscholastic athletic events, especially since this type of litigation is most likely to arise at playoff or tournament time. If an injunction or restraining order is granted erroneously, it will be practically impossible to unscramble the tournament results to reflect the ultimate outcome of the case.[7]

■ Since, by definition, temporary injunctions attempt to place the parties in a position most likely to minimize harm before the court can finally decide the issues raised in a complaint, trial courts are asked to make significant decisions with less-than-complete information. As such, these determinations differ from most decisions reached by trial courts. There are no "drive-through windows" on courthouses for a good reason—judicial decisionmaking demands thought and deliberation of all relevant evidence.

■ The problem is further magnified by the fact that challenges to a voluntary athletic association's eligibility decision typically present issues which require considerable reflection. In general, the members of such associations should be allowed to "paddle their own canoe" without unwarranted interference from the courts.[8] Nonetheless, relief from our judicial system should be available if voluntary athletic associations act arbitrarily and capriciously toward student-athletes.[9] Thus, cases involving challenges to a voluntary athletic association's eligibility decisions involve difficult assessments of a plaintiff's probability of succeeding on his or her claim and complex balancing of competing interests. Because the values a trial court assigns to these competing interests will depend, in part, upon the trial court's assessment of the probability that the athletic association's determination was correct, a circuit court's ruling as to temporary injunctive relief largely hinges upon its preliminary determination of the merits of the plaintiff's claim. Claimants will generally demonstrate potential injuries which justify injunctive relief only when they can show a substantial probability that the athletic association's ruling was arbitrary and capricious.[10] "Longshot" claims which

---

6. Ky.App., 552 S.W.2d 685 (1977).

7. *Id.* at 690.

8. *See Id.* at 687.

9. *See Id.;* 6 Am.Jur.2d (Associations and Clubs) § 28 ("[W]hile courts ordinarily refrain from reviewing decisions of unincorporated private associations, if the organization acts inconsistently with its own rules, its action may be sufficiently arbitrary to invite judicial review." *Id.*); *Indiana High School Athletic Association v. Carlberg,* 694 N.E.2d 222, 230–232 (Ind.1997) (finding review of IHSAA decisions subject to "arbitrary and capricious" review because the Association occupies the role of a quasi-state actor with respect to individual student-athletes).

10. *See KHSAA v. Hopkins Co. Bd. of Educ., supra* note 6 at 690 ("In almost every instance, the possible benefits flowing from a temporary restraining order or injunction will be far outweighed by the potential detriment to the Association, as well as to member schools who are not before the court. Only in rare instances would the granting of the temporary restraining order or injunction be a proper remedy." *Id.*).

have little hope of prevailing when the buzzer sounds will not justify injunctive relief.

■ The deferential standard under which appellate courts review—technically interlocutory but pragmatically final—circuit court determinations as to temporary injunctive relief in these cases only heightens the importance of sound decisionmaking at the circuit court level. Under CR 65.07, the Court of Appeals may reverse such determinations only where it appears that the circuit court has made clearly erroneous findings unsupported by substantial evidence.[11] Interlocutory relief in this Court is appropriate only where we find that it is warranted by "extraordinary cause." Although circuit courts exercise a great deal of discretion in these cases, we provide for interlocutory review of circuit court orders granting or denying interlocutory relief to ensure that the trial courts consider all relevant factors in their decisions.

■ While additional review by this Court is limited to those cases which demonstrate "extraordinary cause,"[12] abuses of discretion by the courts below can supply such cause. In *Commonwealth of*

*Kentucky Revenue Cabinet v. Picklesimer*,[13] this Court addressed the Revenue Cabinet's CR 65.09 motion seeking dissolution of a temporary injunction which prohibited it from preventing Picklesimer from re-taking elected office despite ongoing removal proceedings from a prior term.[14] The Court accepted the Cabinet's argument that CR 65.09 relief could be justified if a trial court's findings were clearly erroneous, but denied relief because it found the trial court's findings supported by substantial evidence.[15]

■ In this case, we find that the trial court abused its discretion by: (1) substituting its judgment for that of the NCAA on the question of Lasege's intent to professionalize; (2) finding that the NCAA has no interest in this case which weighs against injunctive relief; and (3) declaring NCAA Bylaw 19.8 invalid. This combination of clearly erroneous conclusions constitutes extraordinary cause warranting CR 65.09 relief.

## III(B)—REINSTATEMENT OF LASEGE'S ELIGIBILITY

■ The trial court made a preliminary determination that "the arbitrary na-

11. *See Maupin v. Stansbury*, Ky.App., 575 S.W.2d 695, 697–8 (1978):

> Because the injunction is an extraordinary remedy, sufficiency of the evidence below must be evaluated in light of both substantive and equitable principles. Realizing that the elements of CR 65.04 must often be tempered by the equities of any situation, injunctive relief is basically addressed to the sound discretion of the trial court. Unless a trial court has abused that discretion, this Court has no power to set aside the order below.... [I]t is our opinion that the abuse of discretion test is equally applicable in our review of temporary injunctions ....

*Id.* (citations omitted).

12. CR 65.09.

13. Ky., 879 S.W.2d 482 (1994).

14. *Id.* at 483. The narrow temporary injunction did not prohibit the Revenue Cabinet from again removing Picklesimer from office, and "specifically stated that such issue is one to be determined at a later date." *Id.* at 484.

15. *Id.* at 484:

> Under all the circumstances, and with the more than adequate fact-finding and legal conclusions of the trial court, we cannot do else but conclude that since all of the criteria set forth in *Maupin* were considered and met, the action of the trial court in granting the temporary injunction was not clearly erroneous. Therefore, the Cabinet has not met its burden in this argument, of demonstrating extraordinary cause.

*Id.*

ture of the enforcement of its by-laws by the members of the NCAA and its committees raises a substantial issue concerning the merits of their rules." The trial court further found that "Mr. Lasege faces irreparable harm because without reinstatement, he will not be able to continue in classes, and may be deported back to Nigeria." Although we agree with the trial court's assessment of the magnitude of the harm from an erroneous NCAA eligibility decision, we find that Lasege's chances of prevailing on the merits of his claim are too remote to justify injunctive relief. We believe the trial court clearly erred when assessing the merits of Lasege's claim.

■■■ In our opinion, the trial court wrongfully substituted its judgment for that of the NCAA after it analyzed the evidence and reached a different conclusion as to Lasege's intent to professionalize. The mere fact that a trial court considering mitigating evidence might disagree with the NCAA's factual conclusions does not render the NCAA's decision arbitrary or capricious. We have held that a ruling is arbitrary and capricious only where it is "clearly erroneous, and by 'clearly erroneous' we mean unsupported by substantial evidence."[16] Here, the NCAA's ruling has strong evidentiary support—Lasege unquestionably signed contracts to play professional basketball and unquestionably accepted benefits. Contrary to the trial court's allegations of disparate treatment, the NCAA submits that no individual has ever had his or her eligibility reinstated after committing a combination of rules violations akin to those compiled by Lasege. The NCAA's eligibility determinations are entitled to a presumption of correctness—particularly when they stem from *conceded* violations of NCAA regulations. Although we recognize that Lasege's mitigation evidence is relevant to review of the NCAA's determination, we believe the trial court simply disagreed with the NCAA as to the weight which should be assigned to this evidence. Accordingly, we believe the trial court abused its discretion when it found that Lasege had a high probability of success on the merits of his claim.

We also find "extraordinary cause" warranting CR 65.09 relief in the trial court's balancing of the equities. The trial court's order contrasts Lasege's risk of irreparable injury with the NCAA's interest and states that "[t]he NCAA, on the other hand, will not suffer any potential harm by this court's order." We find this conclusion clearly erroneous, and accordingly believe the trial court's subsequent balancing of the equities suffers from an inherent computational error.

The NCAA unquestionably has an interest in enforcing its regulations and preserving the amateur nature of intercollegiate athletics.[17] As the trial court entered a *temporary* injunction on the basis of its *preliminary* findings, the trial court could eventually determine that the NCAA properly denied the reinstatement request. If that is the case, the trial court's order would have erroneously allowed an ineligible player to participate in intercollegiate athletics. While the NCAA has no identifiable interest in the arbitrary application

16. *Thurman v. Meridian Mutual Ins. Co.*, Ky., 345 S.W.2d 635, 639 (1961).

17. *See NCAA v. Jones*, 1 S.W.3d 83, 85 (Tex. 1999) ("The NCAA ... [was] created for the stated purpose of preserving the proper balance between athletics and scholarship in intercollegiate sports. Among other things, the NCAA promulgates rules and regulations to prevent any member institution from gaining an unfair competitive advantage in an athletic program." *Id.*).

of its regulations to the detriment of a student-athlete, it certainly has an interest in the proper application of those regulations to ensure competitive equity.

Here, it appears that the trial court considered the equities of only one party—Lasege—and it overvalued that interest with an unrealistic finding as to Lasege's probability of success on the merits. The trial court could not possibly have weighed the NCAA's interests, because it did not believe the NCAA had any interest for it to consider. Nor does it appear that the trial court gave any consideration to the possible injury to those programs and student-athletes who, because of the temporary injunction, would compete against a U of L Men's Basketball team with Lasege on the roster. In fact, as will be discussed in Section III(C), the trial court stripped the NCAA of even the somewhat ham-fisted, post-hoc restitutionary measures it uses to correct competitive inequities created by court orders. We cannot conclude that the trial court's determination was supported by substantial evidence when it so clearly mischaracterized the equities before balancing them. Logically speaking, a conclusion is flawed when it flows from an invalid premise. We believe this flaw in the trial court's conclusion constitutes clear error and warrants CR 65.09 relief.

We find clearly erroneous both the trial court's finding regarding Lasege's probability of success on the merits and its failure to evaluate the opportunity costs to the NCAA and others when balancing the equities. Accordingly, we vacate that portion of the temporary injunction which declares Lasege eligible to participate in NCAA intercollegiate basketball.

### III(C)—PROHIBITION OF NCAA BYLAW 19.8 RESTITUTION

■■■ We note some disagreement among the parties as to the nature of the trial court's ruling with respect to NCAA Bylaw 19.8. Lasege argues that the trial court prohibited the NCAA from imposing restitutionary sanctions only during the pendency of the temporary injunction. As the bylaw itself allows the NCAA to seek restitution only if the temporary injunction is dissolved, we disagree with this characterization. The language of the order also suggests otherwise:

> The Court also understands that U of L fears that Bylaw 19.8 could be enforced against it. That bylaw permits sanctions to be imposed by the NCAA against member schools if the Court order should be set aside or reversed in some manner. This Court has never seen such an agreement between members of an association that allows sanctions for turning to the courts for assistance when a perceived wrongdoing exists. See Kentucky High School Athletic Ass'n v. Hopkins Co. Bd. of Educ., Ky.App., 552 S.W.2d 685 (1977); Crocker v. Tennessee Secondary School Athletic Ass'n, 908 F.2d 972 (6th Cir. 1990). The judicial power of this Commonwealth cannot be thwarted by members of an association such as the NCAA. Craft v. Commonwealth, Ky., 343 S.W.2d 150 (1961). Consequently, this court declares that the NCAA Bylaw 19.8 is invalid because it prevents parties from availing themselves of the protections of the courts.

In context, therefore, the trial court's order "that the NCAA and its members are hereby ordered to take no action to prevent or interfere with the University of Louisville's ability to abide by this Order by attempting to enforce NCAA Bylaw 19.8" declares an NCAA Bylaw invalid within the Commonwealth of Kentucky and insulates U of L from restitutionary sanctions for allowing Lasege to partici-

pate as a member of its intercollegiate men's basketball team.

At the outset, we observe that the trial court's order gives no indication that it engaged in a CR 65.04 analysis before enjoining the NCAA in this regard, and that reason standing alone would require us to vacate this portion of the injunction. It appears that the trial court included this prophylactic measure, at U of L's urging, simply to facilitate its other order by permitting U of L the "risk-free" right to allow Lasege to play basketball. In any event, we can find no interest which would justify such injunctive relief. Accordingly, we find that the trial court abused its discretion when it prohibited the NCAA from seeking NCAA Bylaw 19.8 restitution.

By becoming a member of the NCAA, a voluntary athletic association, U of L agreed to abide by its rules and regulations. NCAA Bylaw 19.8 is one of those regulations, and it specifically provides that the NCAA can attempt to restore competitive equity by redistributing wins and losses and imposing sanctions upon a member institution which allows an ineligible player to participate under a subsequently-vacated court order, even if that order *requires* the institution to allow the player to participate. As the Indiana Supreme Court recently noted when addressing an identical issue concerning the Indiana High School Athletic Association ("IHSAA")'s restitution rule, such contractual risk allocation is no stranger to the courts:

> Contracts frequently allocate risks of unfavorable litigation results. For example, contracting parties agree that should a judgment, order or settlement prohibit a party from enjoying the benefits of the agreement, that party shall have no further obligations with respect to the contract. Doctors and attorneys purchase insurance so as to protect themselves from the consequences of lawsuits. Couples may sign prenuptial agreements dictating what is to occur should a trial judge determine that the prenuptial agreement is unenforceable. Such agreements show no disrespect to the courts.
>
> We presume that the judgments of our trial courts are correct and valid—but sometimes they are wrong. If a school wants to enjoy the benefits of membership in the IHSAA, the school agrees to be subject to a rule that permits the IHSAA to require the school to forfeit victories, trophies, titles and earnings if a trial court improperly grants an injunction or restraining order prohibiting enforcement of IHSAA eligibility rules. Such an agreement shows no disrespect to the institution of the judiciary.
>
> Member schools voluntarily contract to abide by the rules of the organization in exchange for membership in the association. One of those rules is the Restitution Rule. Undeniably, the Restitution Rule imposes hardship on a school that, in compliance with an order of a court which is later vacated, fields an ineligible player. On the other hand, use of an ineligible player imposes a hardship on other teams that must compete against the teams fielding ineligible players. While schools will contend that is unfair when they have to forfeit victories earned with an ineligible player on the field because they complied with a court order, competing schools will reply that it is unfair when they have to compete against a team with an ineligible student athlete because a local trial judge prohibited the school or the IHSAA from following the eligibility rules. The Restitution Rule represents the agreement of IHSAA members on how to balance

those two competing interests. The Restitution Rule may not be the best method to deal with such situations. However, it is the method which the member schools have adopted. And in any event, its enforcement by the IHSAA does not impinge upon the judiciary's function.[18]

▇ In fact, contrary to the belief of the trial court the concept of "risk-free" injunctive relief is unheard of—CR 65.05 requires the party in whose favor the injunction is granted to post a bond [19] and wrongfully enjoined parties may recover compensatory damages.[20] Here, U of L and the other NCAA members reached an agreement as to how competitive equity should be restored in the event of an erroneous court determination regarding a player's eligibility, and the trial court simply released U of L from that obligation.

The trial court's belief that the NCAA's Restitution Rule "thwarts the judicial power" is simply without foundation. NCAA Bylaw 19.8, like the Restitution Rules enforced by many state high school athletic associations "does not purport to authorize interference with any court order during the time it remains in effect, but only authorizes restitutive penalties when a temporary restraining order is ultimately dissolved and the challenged eligibility rule remains undisturbed in force." [21] The authority of the courts is thus in no way compromised, and NCAA Bylaw 19.8 merely allows for post-hoc equalization when a trial court's erroneously granted temporary injunction upsets competitive balance. If the trial court's preliminary conclusions carry the day, and a student-athlete's eligibility is confirmed by final determination, no restitutionary remedy is warranted or appropriate, and NCAA Bylaw 19.8 provides for none.

The trial court's curt conclusion that NCAA Bylaw 19.8 "prevents parties from availing themselves of the protections of the courts" does not disclose the basis for this opinion. Perhaps the trial court believed that NCAA Bylaw 19.8 would deter aggrieved student-athletes from seeking judicial redress because of fears that their efforts would only hurt their teams in the long-run. Perhaps the trial court believed that the bylaw created a disincentive for NCAA member institutions to allow players whose eligibility has not yet been finally adjudicated to play in games or other athletic events. Neither conclusion would justify the trial court's order. The decision to seek injunctive relief will always involve a calculated risk on the part of the plaintiff, and those with meritorious claims

---

18. *IHSAA v. Reyes*, 694 N.E.2d 249, 257–8 (Ind.1997). *See also Cardinal Mooney High School v. Michigan High School*, 437 Mich. 75, 467 N.W.2d 21, (1991):

[W]e find rule 3(D) to be a valid restitutive provision. It is reasonably designed to rectify the competitive inequities that would inevitably occur if schools were permitted without penalty to field ineligible athletes under the protection of a temporary restraining order, pending the outcome of an ultimately unsuccessful legal challenge to one or more eligibility rules.... [T]he member schools of the MHSAA have voluntarily agreed to submit to the MHSAA's regulations, including rule 3(D), as a condition of their membership.

*Id.*

19. *See* CR 65.05(1): ("No restraining order or temporary injunction shall be granted except upon the giving of a bond by the applicant, with surety, in such sum as the court or the officer to whom application is made deems proper, for the payment of such costs and damages as may be incurred or suffered by any person who is found to have been wrongfully restrained or enjoined...." *Id.*).

20. *See Brundige v. Sherwin–Williams Co.*, Ky. App., 551 S.W.2d 268 (1977).

21. *Cardinal Mooney High School v. Michigan High School, supra* note 18 at 22.

will decide to proceed. Rather than changing the rules in the middle of the game, trial courts should consider the possibility that an erroneous decision could result in restitutionary sanctions against a student-athlete's institution when they balance the equities.

We recognize that the Court of Appeals reached a different conclusion in one paragraph in *Hopkins* —a case in which the parties did not seek discretionary review in this Court. For the reasons explained above, we find this conclusion unsound, and we overrule *Hopkins* to the extent that it holds that injunctive relief prohibiting a voluntary athletic association from seeking agreed-upon restitutionary sanctions is appropriate.

Accordingly, we vacate that portion of the temporary injunction which prohibits the NCAA from potentially pursuing NCAA Bylaw 19.8 restitution.

## IV. MISCELLANEOUS MATTERS

Although we note that the trial court retains the power to enforce its orders,[22] we can find no authority to support Lasege's assertion that the NCAA's "unclean hands" prevent them from pursuing interlocutory relief.

We do not address the NCAA's allegations that the temporary injunction violates First Amendment freedom of association principles and the commerce clause because neither issue was raised before the trial court.

In the interest of efficient attention to this matter and after observing that the parties fully briefed the issues in this matter, we deny the NCAA's motion for oral argument.

## V. CONCLUSION

For the reasons outlined above, we find "extraordinary cause" warranting CR 65.09 relief and vacate the trial court's temporary injunction in its entirety.

COOPER, GRAVES and STUMBO, JJ., concur.

JOHNSTONE, J., dissents by separate opinion with LAMBERT, C.J. and WINTERSHEIMER, J., joining that dissent.

## APPENDIX—NCAA BYLAW 19.8 (RESTITUTION)

If a student athlete who is ineligible under the terms of the constitution, bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Management Council may take any one or more of the following action against such institution in the interest of restitution and fairness to competing institutions:

(a) Require that individual records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;

(b) Require that team records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;

(c) Require that team victories achieved during participation by such ineligible student-athlete shall be abrogated and the

---

**22.** *See Hale v. Cundari Gas Transmission Co.,* Ky., 454 S.W.2d 679 (1969).

games or events forfeited to the opposing institutions;

(d) Require that individual awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(e) Require that team awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(f) Determine that the institution is ineligible for one or more NCAA championships in the sports and in the seasons in which such ineligible student-athlete participated;

(g) Determine that the institution is ineligible for invitational and postseason meets and tournaments in the sports and in the seasons in which such ineligible student-athlete participated;

(h) Require that the institution shall remit to the NCAA the institution's share of television receipts (other than the portion shared with other conference members) for appearing on any live television series or program if such ineligible student-athlete participates in the contest(s) selected for such telecast, or if the Management Council concludes that the institution would not have been selected for such telecast but for the participation of such ineligible student-athlete during the season of the telecast; any such funds thus remitted shall be devoted to the NCAA postgraduate scholarship program; and

(i) Require that the institution that has been represented in an NCAA championship by such a student-athlete shall return 90 percent of its share of the net receipts from such competition in excess of the regular expense reimbursement, or if said funds have not yet been distributed, require that they be withheld by the president.

JOHNSTONE, Justice, dissenting.

Respectfully, I dissent from the majority's Opinion and Order granting CR 65.09 relief to the National Collegiate Athletic Association (NCAA). In my opinion, the NCAA has not demonstrated "extraordinary cause" justifying such relief.

CR 65.09 provides in pertinent part:

(1) Any party adversely affected by an order of the Court of Appeals in a proceeding under Rule 65.07 or Rule 65.08 may within five (5) days after the date on which such order was entered, move the Supreme Court to vacate or modify it. The decision whether to review such order shall be *discretionary* with the Supreme Court. Such a motion will be entertained only for *extraordinary cause* shown in the motion.

Emphasis added.

The review provided by this rule is discretionary and entertained only for extraordinary cause. In past cases dealing with the extraordinarily high threshold of "extraordinary cause," we have considered whether the trial court considered carefully the requirements for issuing injunctive relief set out in the seminal case of *Maupin v. Stansbury*, Ky.App., 575 S.W.2d 695 (1978). They are: (1) has the plaintiff shown an irreparable injury; (2) are the equities in plaintiff's favor, considering the public interest, harm to the defendant, and whether the injunction will merely preserve the status quo; and (3) does the complaint present a substantial question?

In the case before us, the trial judge conducted a thirteen hour hearing and determined that the *Maupin* elements had been met. A panel of the Kentucky Court of Appeals presided over two and one-half hours of oral argument, considered exten-

sive memoranda, and concluded that the trial judge's findings were not clearly erroneous, and that the trial court did not abuse its discretion.

Despite the majority's acknowledgment of the deferential standard under which appellate courts review circuit court determinations as to temporary injunctive relief, the opinion criticizes the trial court for abusing its discretion by "(1) substituting its judgment for that of the NCAA on the question of Lasege's intent to professionalize; (2) finding that the NCAA has no interest in this case which weighs against injunctive relief; and (3) declaring NCAA Bylaw 19.8 invalid."

First, it goes without saying that a trial court must do an appropriate amount of fact finding in determining whether a party is entitled to injunctive relief. Even a cursory review of the trial court's detailed findings reveals that the trial judge considered the evidence presented and all relevant factors before making the initial conclusions necessitated by proceedings involving injunctive relief. I would agree that there has been a substitution of judgment in this case, but it has been the majority substituting its judgment for the trial judge.

Second, the majority complains that the trial court abused its discretion by finding that the NCAA has no interest in this case which weighs against injunctive relief. Despite repeated reviews of the trial court's findings and order, this writer can locate no such finding. Indeed, the opinion sets out thoroughly the positions and arguments espoused. Simply put, the trial judge did not agree with the NCAA—the majority does.

Finally, the provision of the trial court's order dealing with NCAA Bylaw 19.8 states:

IT IS FURTHER ORDERED and ADJUDGED that the NCAA and its members are hereby ordered to take no action to prevent or interfere with the University of Louisville's ability to abide by *this Order* by attempting to enforce NCAA Bylaw 19.8.

*Findings and Order Granting Injunctive Relief Order*, 2000–CI–7609 at 9 (Jefferson Circuit Court entered December 20, 2000) (emphasis added).

I believe that one could reasonably conclude from a reading of this provision that it applies only during the period of the injunctive relief. Regardless, the majority opinion overrules *Kentucky High School Athletic Association v. Hopkins County Board of Education*, Ky.App., 552 S.W.2d 685 (1997), and then rules that injunctive relief prohibiting a voluntary athletic association from seeking agreed-upon restitutionary sanctions is inappropriate. Such action, in my opinion, is unwarranted and premature.

The primary fallacy of the majority's opinion revolves around its proposition that cases involving voluntary athletic associations are more troubling than all other cases involving injunctive relief. While they may "pose special difficulties," most cases seeking injunctive relief are "invariably time sensitive" that place trial judges in the position of having to "make significant decisions with less-than-complete information." It is easy to conclude in this case, as did the trial judge, that the NCAA's ruling did not have evidentiary support. The trial court was presented with substantial evidence to conclude that the complaint raised a substantial question, that the NCAA treated Lasege differently from other athletes, that the NCAA failed to appropriately consider mitigating evidence, and that the arbitrary actions of the NCAA posed a risk of irreparable injury to the plaintiff.

92

Today, the majority charts new ground for cases involving voluntary athletic associations like the NCAA. Longstanding precedent regarding the propriety of injunctive relief is ignored and a special class is produced by this holding. I would deny the relief requested and return this case for further proceedings to the trial court where it belongs.

LAMBERT, C.J., WINTERSHEIMER, J., join this dissenting opinion.